STATE OF WEST VIRGINIA

*v.*

RUTH MALEY

(No. 12560)

Submitted January 24, 1967.     Decided April 4, 1967.

Calhoun, President and Berry, Judge dissenting; Judge Berry concurs in dissenting opinion.

*Kay, Casto & Chaney, Robert H. C. Kay, Edward W. Hiserman,* for plaintiff in error.

*C. Donald Robertson,* Attorney General, *Leo. Catsonis,* Assistant Attorney General, for defendant in error.

BROWNING, JUDGE:

Defendant, Ruth Maley, was indicted by the grand jury attending the January, 1965, term of the Intermediate Court of Kanawha County for the offense of, while a state officer or employee, making or causing to be made false entries in the written accounts kept by the state with the intention to conceal the true state of such accounts. A motion to quash the indictment and a joint demurrer and motion to quash were overruled; a motion that the judge disqualify himself was similarly overruled and the case proceeded to trial. The jury returned a verdict of guilty, motions to set aside the verdict and award a new trial on assigned errors and on the grounds of after discovered evidence were overruled and defendant was sentenced to a term of from one to ten years in the state prison for women, to which judgment, a writ of error having been refused by the Circuit Court of Kanawha County, this Court granted a writ of error and supersedeas on March 11, 1966.

The evidence shows that, subsequent to a flood in the month of July, 1961, Kanawha and six other counties were designated as disaster areas under Public Law 875. On August 1, 1961, defendant was employed to act as liaison between the federal and state agencies involved and to facilitate the work of the program. In connection with her duties she supervised the finance section of the program, that is, invoices for labor, equipment and materials used in the program were submitted to her section where they were checked against time sheets kept by her subordinates and, if accurate, a trasmittal order with the invoices attached was approved by her and processed for payment. It is not denied that she bore the responsibility for determining the accuracy of the transmittal sheet, which was used as a basis for payment and retained in the

files of the state auditor, and it is in connection with several transmittal sheets, with attached invoices, which were introduced in evidence by the state that the present charges were brought. These transmittal sheets approved for payment certain invoices submitted by Belich Construction, Stanton Construction Co., and H. Lacey Company for work done on certain days. Time records, also introduced in evidence, kept by a time-keeper employed in defendant's section, do not show any work by those companies on the days for which payment is claimed on the invoices. No contention is made by the state that the work was not done but only that, while the work was in fact done by Pioneer Construction Company, invoices were submitted in the names of the above mentioned companies at the instigation of defendant and approved by her on the transmittal sheets in order to conceal the true state of accounts.

In support of the charge, the state offered evidence of the above facts and also testimony that defendant made frequent appearances at the various job locations observing the equipment at work and that the time records were sometimes handed to her or placed on her desk by the timekeeper. Mr. Jim Stuckey, part owner and field supervisor of the Pioneer Construction Company, testified that he had frequent conversations with defendant and with regard to invoicing, defendant had told him that because of political pressure she could not approve an invoice amounting to more than $5,000.00 and suggested billing through other people. On cross-examination, the witness testified that Pioneer Construction Company leased equipment employed on the project from three other companies and subcontracted from others, and reiterated that defendant had first suggested billing in other people's names and in subsequent conversations had stated to him: "Why don't you bill it through your subcontractors?" Mrs. Joyce Bass, secretary to Alex Dandy, a part owner of Pioneer Construction Company, testified that she prepared the Pioneer invoices,

as well as those for Belich, Stanton and Lacey at Mr. Dandy's direction. Mrs. Bass stated that she talked by telephone with defendant on several occasions when there was a discrepancy between the time charged on the invoices and the time records in the defendant's office and, on one occasion, an invoice which had been returned three or four times, was broken down into two or three different companies on the basis of work sheets supplied by Mr. Dandy. She then telephoned the defendant and "told her what piece of equipment I had on each invoice, and the amount of time, and she said it was O.K., or something of that nature." The state offered other evidence that while only one Insley "backhoe" was used on the work the same appeared at various times on the invoices of Pioneer, Belich and Lacey.

For the defendant, Richard Wolfe testified that he was employed as bookkeeper or office supervisor; some invoices came to him and some to the defendant; he took the invoices, checked them against the timekeepers' records and prepared transmittals, which he then submitted to the defendant; if there were discrepancies, he sometimes checked with the timekeeper and sometimes with the defendant; both he and defendant checked time records and *sometimes persons working for him;* he did not know who prepared the transmittals for the Belich, Stanton or Lacey invoices; and, *he never saw defendant prepare a transmittal sheet.* On cross-examination, Mr. Wolfe stated that he would have disallowed the invoices approved by the transmittals in evidence; he would have taken the discrepancies up with the defendant, if he had seen them; and, that he and the defendant had the responsibility to see that they were correct. On redirect the witness stated that someone in the office, the *clerks, himself or defendant prepared the transmittals* and if he or others had prepared them, the *defendant only saw the transmittal and attached invoice, not the time sheets.*

Defendant testified as to her employment, and that: the finance section would compare invoices against the time records as they came in; if there was a discrepancy it was brought to her attention and, if not, a transmittal sheet was prepared in the finance section and with the attached invoices was submitted to her; she then checked the arithmetic and processed it for payment; it was suggested, previous to the dates of the transmittal involved that she initial the transmittals to show that she had seen them; she was responsible for the correctness of the transmittals but relied upon her staff; she did not remember a specific conversation with Stuckey, but did recall that a complaint was received from a person claiming to be a subcontractor of Pioneer that he had not received payment and she suggested to Pioneer that it permit its subcontractors to submit invoices in their own names; she did not recall any conversation with Mrs. Bass relating to Belich, Stanton or Lacey; and, she did not falsify or cause to be falsified any of the transmittal sheets in evidence. On cross-examination the defendant testified that she directed that an investigation be made of the facts relative to whether subcontractors were performing Pioneer's work but no findings were ever reported to her directly. Defendant also offered by avowal the evidence that a federal audit was satisfactorily completed.

Eighteen errors are assigned in this Court but the assignment which gives the Court immediate concern is that questioning the sufficiency of the evidence. ''In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the accused beyond a reasonable doubt, though the evidence adduced by the accused is in conflict therewith. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.'' Syl. Pt. 1, *State*

*v. Bowles,* 117 W. Va. 217, 185 S. E. 205; *State v. Stevenson,* 147 W. Va. 211, 127 S. E. 2d 638; *State v. Etchell,* 147 W. Va. 338, 127 S. E. 2d 609; *State v. Spradley,* 140 W. Va. 314, 84 S. E. 2d 156; and cases cited therein. A new trial will not be granted in a criminal case on the ground of insufficiency of the evidence, where the verdict is based on oral testimony and involves the credibility of the witnesses. *State v. Spradley,* 140 W. Va. 314, 84 S. E. 2d 156; *State v. Stowers,* 66 W. Va. 198, 66 S. E. 323. "If a new trial depends upon the weight of testimony or inferences from it, the jury are exclusively and almost uncontrollably the judges." Syl. Pt. 1, *State v. Etchell,* 147 W. Va. 338, 127 S. E. 2d 609. However, the law requires the state in a criminal case to establish the guilt of a defendant, by competent evidence, beyond a reasonable doubt. *State v. Hudson,* 128 W. Va. 655, 37 S. E. 2d 553, 163 A.L.R. 1265. While a conviction may rest entirely upon circumstantial evidence, *State v. Sheppard,* 49 W. Va. 582, 39 S. E. 676, such evidence must be consistent with the hypothesis of guilt and exclude every other reasonable hypothesis of innocence. "To convict on circumstantial evidence alone, it should to a moral certainty exclude every hypothesis but that of guilt; and circumstantial evidence should always be scanned with caution." Syl. Pt. 2, *State v. Bennett,* 93 W. Va. 548, 117 S. E. 371. Suspicion alone, however strong, is not enough, *State v. Dudley,* 96 W. Va. 481, 123 S. E. 241, and "When two inferences, equally plausible, may be drawn from the evidence, the law does not permit the jury to adopt the one more unfavorable to the accused. . . ." Syl., *State v. Kelly,* 105 W. Va. 124, 141 S. E. 633. Applying these principles to the case at bar leads us to the conclusion that the evidence is insufficient to justify or sustain the verdict of guilt rendered against the defendant.

To summarize briefly the circumstances which may be presumed to have been established by the state tending to show a culpability on the part of the de-

fendant: she was the person ultimately responsible for the accuracy of the transmittals; the time sheets, in most, but not all, instances were given to her or placed on her desk; she suggested to Stuckey that billings be made in the name of other persons or subcontractors; Mr. Wolfe stated that he did not prepare the transmittals in evidence, and would have disallowed the invoices involved, although he also states that he never observed the defendant prepare a transmittal sheet and that others in the office did so; and, Mrs. Bass stated that, after one particular invoice had been rejected for some error in time or arithmetic on several occasions, she, on instructions and information supplied by Mr. Dandy, prepared invoices in the names of Stanton and Lacey, telephoned the defendant and informed her of the times and equipment allotted to those companies to which the defendant replied: "O.K."; she also testified that a Belich invoice was returned because of a one dollar error in arithmetic. When considered together, do these circustances point unerringly to defendant's guilt? We do not believe so. The defendant was charged with the supervisory duties of an office or section in which Mr. Wolfe and others were employed and it is uncontroverted that others in the office besides Mr. Wolfe and the defendant prepared transmittals, in which case, the defendant saw only the transmittals and invoices, not the time sheets. In such cases, the defendant would have had no opportunity to do anything but ascertain that the arithmetic on the invoices was correct, which is consistent with the testimony of Mrs. Bass in regard to her telephone conversations with the defendant previous to the conversation as to the Stanton and Lacey invoices. Her suggestion to Stuckey is susceptible of two inferences, one of guilty intent and one entirely innocent. Leased or subcontracted equipment, which Mr. Stuckey admits was used by Pioneer, would ordinarily bear the owner's identification and if, as testified to by Mr. Houck and Mr. Stuckey, defendant was frequently at the job locations, it could be reason-

ably inferred that she observed this fact. The same applies to her conversation with Mrs. Bass at the time of the Stanton and Lacey invoices. There is no evidence to show that defendant at that time was aware, or should have been aware, that Stanton and Lacey had done no work on the program, had before her the time sheets for the dates involved, or took any subsequent action with regard to those invoices at a time when she should have been aware of their falsity. The evidence is that she answered the telephone, was told that Stanton and Lacey invoices had been prepared with certain pieces of equipment at so many hours, to which she replied, "O.K."

In short, there is no evidence in this case which is not as susceptible of the hypothesis of defendant's innocence as that of her guilt. Admittedly, the circumstances set forth create strong suspicion but, as heretofore said, suspicion, however strong, is not enough. Such circumstances must, to a moral certainty, exclude every hypothesis save that of guilt and where two inferences may be drawn, equally plausible, the law does not permit the jury to adopt the one more unfavorable to the accused.

As the evidence does not establish the guilt of the defendant beyond a reasonable doubt, the verdict should have been set aside by the trial court and its action in failing to do so constituted reversible error. As the case must be remanded for a new trial, we need not discuss the other assignments of error pertaining to the trial of the case. Those pertaining to preliminary questions we find without merit. The judgments of the circuit court and the intermediate court are reversed, the verdict of the jury is set aside, and the case is remanded to the Intermediate Court of Kanawha County for a new trial.

*Reversed; verdict set aside; new trial awarded.*

CALHOUN, PRESIDENT, dissenting:

Ruth Maley, the defendant, was ably and vigorously represented by competent counsel at her trial and in preliminary proceedings before her trial on March 8, 9 and 10, 1965, in the Intermediate Court of Kanawha County. The trial jury returned a verdict of guilty as charged in the indictment. In her behalf, a motion was made to set aside the verdict and to award her a new trial. Twenty-five assignments of error were made in support of the motion. The motion was argued by counsel and on June 23, 1965, it was overruled. Thereby the verdict was approved by the judge of the trial court.

On October 20, 1965, a petition was filed in behalf of the defendant in the Circuit Court of Kanawha County, sitting as an intermediate appellate court, for a writ of error and supersedeas to the judgment of the intermediate court. A transcript of the testimony and of other trial proceedings accompanied the petition. In support of the petition, all assignments of error which had been urged in the trial court were reasserted. On November 16, 1965, the circuit court denied the prayer for a writ of error and supersedeas on the ground that the judgment of the trial court was "plainly right". Thereby the verdict of the jury was approved by the judge of the circuit court.

On this appeal, the verdict returned by the jury, and approved by judges of two courts of record of Kanawha County, is overturned by a divided Court on the single ground that the verdict is not warranted by the evidence. In my opinion, the jury verdict is amply warranted by the law and the evidence. I believe none of the other numerous assignments of error is of such character as to have caused any serious concern to either of the judges who have previously approved the verdict or to any of the members of this Court.

*State ex rel. Brown v. Thompson,* 149 W. Va. 649, 142 S. E. 2d 711, involved the sufficiency of an indictment charging that Alex Dandy, James V. Brown, Emil Belich, Harry Lacey and John Stanton "did feloniously counsel with, aid and abet" Ruth Maley in the commission of the felony of which she was convicted in the instant case. In unanimously upholding the sufficiency of the indictment as it related to James V. Brown, which indictment included a charge of Ruth Maley's commission of the felony substantially as it is alleged in the indictment in the instant case, the Court discussed the provisions and the historical background of Code, 1931, 61-3-22, as amended, the statute upon which the indictment in the instant case is based.

The portion of the statute upon which the indictment is predicated is as follows: "If any officer, clerk or agent of this State, * * * make, alter or omit to make any entry in any book of account of, or in any account kept by such State, * * * with intent in so doing to conceal the true state of any account, * * * such officer, clerk or agent shall be guilty of a felony, * * *." The indictment charges that Ruth Maley, "being then and there an employee, officer, clerk and agent of the State of West Virginia, did knowingly, unlawfully and feloniously make and cause to be made false entries in the written accounts kept by said State of West Virginia, by preparing and submitting, and causing to be prepared and submitted false transmittal sheets in writing accompanied by false statements and invoices in writing for Pioneer Construction Co., Inc., a corporation, to the Auditor of the State of West Virginia, which said written accounts, statements, invoices and transmittal sheets were kept by the State of West Virginia, with intent in so doing to falsify, alter and conceal the true state of said written accounts, * * *."

The indictment, in conformity with usual principles of criminal law pleading, employs the conjunctive word "and" instead of the disjunctive word "or" in

charging the offense. In essence, the indictment charges that the defendant made and caused to be made false entries in written accounts kept by the state by preparing and submitting, and by causing to be prepared and submitted, false transmittal sheets in writing for Pioneer Construction Co., Inc., with intent in so doing to falsify, alter and conceal the true state of such written accounts. The proof amply discloses that she committed the offense thus charged.

The statute does not require proof that the state, or any person, firm or corporation was defrauded of money or of any other thing of value or that the accused person received any financial gain or other benefit. The statute, as it relates to this case, merely requires proof that the defendant made, altered or omitted to make an entry in any account kept by the state with intent in so doing to conceal the true state of such account.

In the brief of able and distinguished counsel who represented the defendant in this Court, much emphasis is placed upon an alleged failure of proof of "criminal intent," "*mens rea*," and "intent to commit the offense." The only intent required by the statute is the intent, in making or omitting to make an entry in any account kept by the state, to conceal the true state of such account. No other or more reprehensible or more evil intent is required. It is not for us to undertake to read something else into the statute.

This case, I believe, eloquently proclaims the sound and salutary basis and reason for the statute involved in this case. The proof warranted the jury in finding that the scheme which culminated in false invoices, false transmittal sheets and ultimately in payment of public funds to persons, or to real or fictitious firms or corporations not entitled thereto, resulted from complaints that an inordinate volume of the flood relief work was being given to Alex Dandy, or to Pioneer Construction Co., Inc., which he appears large-

ly to have dominated or controlled. Complaints to this effect reached high places. Embarrassment and political repercussions resulted or were threatened. It was deemed important, therefore, to make, or cause to be made, false entries in accounts kept by the state in order to "conceal the true state of" such accounts.

In July, 1961, there occurred heavy rains which resulted in floods and consequent damage to an area which included a part of Kanawha County. A program for alleviation and repair of damage thus caused was initiated. For this purpose, a Disaster Recovery Agency was organized within the Department of Commerce to administer the program. Ruth Maley, the defendant, an engineer, was employed by the Disaster Recovery Agency, and Floyd Houck became its official timekeeper.

Pioneer Construction Co., Inc., which may hereafter be referred to in this opinion as Pioneer, was organized during the fall or winter of 1961, apparently for the sole purpose of doing work for the Disaster Recovery Agency in connection with the damage done by the heavy rains and floods which occurred in July of that year. The record does not indicate that Pioneer engaged in any other work or business.

James Stuckey, a real estate broker and general contractor, testified that he, Alex Dandy and James V. Brown were "supposed to own a third" each in the corporation, though he received no stock; that the corporation was engaged in the "cleanup work" following the 1961 flood; that the State of West Virginia was the "principal customer" of the corporation; that the corporation leased an Insley backhoe from the Joe Burford Company; that in behalf of the corporation he was in charge of the "actual supervision of the construction on the job;" that, as a consequence of a misunderstanding, he was "fired" by Dandy; that each week, around the end of the week, he would confer with Floyd Houck, "timekeeper for the State", in order to reconcile the time kept be-

fore it was "turned in to the State"; and that, on frequent occasions, he had conversations with Ruth Maley, including frequent conversations in relation to invoices submitted in behalf of Pioneer. Concerning his conversations with Ruth Maley in reference to the procedure to be followed in submitting invoices in behalf of Pioneer, he testified as follows:

"The first conversation I remember with reference to the billing was after we had several pieces of equipment working.

* * *

"She suggested that the bills would have to be billed through other people rather than a lump sum bill, she couldn't approve an invoice over five thousand dollars.

* * *

"Well, she indicated that political pressure was being put on her to put additional equipment on, other contractors, people would have a piece of machinery or such that—people that were in the State that could bring pressure to bear on her; and she had all she could supervise at present."

Mr. Stuckey testified further that Mrs. Joyce Bass, Alex Dandy's secretary, was employed to "keep the records of" Pioneer; that he kept time on each piece of Pioneer's equipment used on the job, and that it was "turned in to Mrs. Bass for billing to the State"; that he had been in the contracting business for about fourteen years; that he knew Harry M. Lacey but that, to his knowledge, Lacey had never been in the contracting or heavy equipment business; that he knew a man named Emil Belich, who was engaged in the construction of residential and commercial properties, "but not in heavy equipment"; that he had never heard of a construction firm known as Stanton Construction Company; that, during the time he was on these state jobs, he never knew of any work being done in that connection by Belich Construction Company, the H. Lacey Company or the Stanton Con-

struction Company; that when he left the job, he was replaced by Mr. Dandy's brother-in-law, Sam Hazemy; that Ruth Maley, "on occasions", suggested that the billing or invoices for work done by Pioneer be submitted in the names of Pioneer's subcontractors; that she was on the job several times a week; that the Insley backhoe was on lease and it was not used on the basis of a subcontract; that he relied upon Alex Dandy to take care of the billing to see that money for work done was collected from the State of West Virginia; and that he did not do any of the billing, he merely took the time to Pioneer's office.

Mrs. Joyce Bass was employed by Alex Dandy. During the period of time here in question she also did work for Pioneer and, in that employment, took her orders from Alex Dandy. She testified that, in connection with the work done by Pioneer, James Stuckey was the foreman on the job; that she prepared the invoices after Mr. Stuckey "turned in the time on equipment"; that, after the invoices were prepared, she delivered them to Alex Dandy or, in his absence, put them on his desk; and that there came a time in 1962 when there arose a difficulty in collecting money due Pioneer from the state. When asked about the circustances, she testified: "* * * I prepared invoices several times and sent them up, and it was sent back, and I think I prepared the invoice three or four times, and sent it back three or four times. * * *. Well, after I prepared the invoice several times, I had gotten sort of irritated, Mr. Brown brought one of the invoices down, sort of throwed it on the desk, and said —". At this point the court sustained a defense objection and the witness was not permitted to state what Brown said.

Mrs. Bass testified that thereafter the invoice "was broken down into two or three different ones." At that point, she received from Alex Dandy work sheets "already broken down to the pieces of equipment going to each company." Thereafter she got in touch

with Ruth Maley. In that connection, Mrs. Bass testified: "* * * I asked her, I told her what piece of equipment I had on each invoice, and the amount of time, and she said it was O. K., or something of that nature." When Mrs. Bass prepared invoices in the names of H. Lacey Company and Stanton Construction Company, she told Ruth Maley "what pieces of equipment that I had on each company, and the amount of time on each one." Mrs. Bass identified an invoice which she prepared in the name of Belich Construction Company for use of an Insley backhoe on the job for eighty hours at $20 an hour, though the record discloses without the slightest contradiction or doubt that the only Insley backhoe on the job was the one which was leased and used by Pioneer. Mrs. Bass identified numerous exhibits of a similar character. One thing which appears unmistakably from the record is that false invoices were prepared and processed in the names of companies, real or fictitious, which had no equipment on the job and performed no work on the job and that payment was made from public funds in the names of such real or fictitious companies, but eventually received by Pioneer.

David Callaghan testified that, during the period of time here in question, he was employed by the Department of Commerce; that during that time he knew Ruth Maley; that for a time he worked on the flood disaster program of the department and participated with her and others in staff meetings; that, basically, she was coordinator of the flood disaster program; that she "or someone working directly under her, a typist or bookkeeper, were responsible for preparing transmittal sheets", which involved receiving the invoices from the contractors and people who had claims and preparing these in transmittal form for submission to the Commissioner of the Department of Commerce for signature to go thereafter to the State Auditor for payment. On cross-examination by counsel

for Ruth Maley, Mr. Callaghan was asked the following questions and gave the following answers:

"Q. And you don't know under whose direction they [the transmittal sheets] were made?

"A. Yes, sir, I do.

"Q. Whose?

"A. They were prepared under Mrs. Maley's direction.

Paul Boiarsky, called as a witness for the defendant, testified that during the period of time here in question, he was administrative assistant to the Commissioner of the Department of Commerce. With obvious reluctance, he testified that it was Ruth Maley's job to see "that the transmittals were done correctly." Some of the questions propounded to him on cross-examination and answers given by him in that connection were as follows:

"Q. But you do know that Mrs. Maley was in charge of seeing that the transmittals were done correctly, don't you?

"A. That is correct.

"Q. Now, isn't it further true that as an aid to seeing that those transmittals were done correctly, she had available to her the time records from the men in the field who kept time on these equipment pieces and kept check on those contracts, isn't that true, Mr. Boiarsky?

"A. To my knowledge, yes.

                          *   *   *

"A. * * * The invoices would have to be attached to the transmittals so they could be put through for payment.

"Q. And wasn't that invoice attached either by her or under her direction?

"A. Theoretically.

"Q. What do you mean, 'theoretically'?

"A. Basically.

"Q. Do you mean that was her job to do that; that is what you mean, don't you?

"A. Well, it would be her job to do it, just as it would be the job in any bookkeeping operation to make sure that invoices were attached to transmittals.

\* \* \*

"Q. And she was in charge of the section, isn't that right?

"A. Yes, sir, she was.

"Q. She was the boss of that section?

"A. Yes.

"Q. And among the safeguards that were set up by her were that the State timekeepers would keep tab on these contractors, isn't that right?

"A. Yes, sir, I would assume so, I don't remember it has been a long time ago.

"Q. And wasn't one of the safeguards a comparison of those State-kept time records to be compared with the invoice that the contractor would later submit—that is true, isn't it?

"A. The time records with the invoices of the contractors?

"Q. Yes.

"A. Yes, sir, that is right.

"Q. And unless those compared accurately, it was Mrs. Maley's job to not approve the transmittal for payment, wasn't it?

"A. It was the job of her section.

"Q. Wasn't it her job?

"A. Theoretically, as director of the section, yes.

"Q. Not 'theoretically', but in practicality wasn't it her job?

"A. In practicality it was her job, yes, sir, Mr. Casey."

Robert Bell, cashier of the Gauley National Bank, Gauley Bridge, West Virginia, testified that a warrant or check of the State of West Virginia for $4,999, payable to Belich Construction, was received and applied by his bank as a credit on a note of Pioneer Construction Company, signed by James V. Brown, as guarantor. This state warrant was made pursuant to an invoice and a transmittal which indicated that the sum of $4,999 was due Belich Construction, including $1600 for the use of an Insley backhoe for eighty hours at the rate of $20 an hour, as stated previously in this opinion. The invoice bears the initials "R. M.".

Floyd Houck, official timekeeper on the job for the Disaster Recovery Agency, testified that he kept records of companies using equipment and turned his official time sheets over to Ruth Maley. He did not turn in any time for Belich Construction Company, Lacey Construction Company or Stanton Construction Company. There appeared in the record an invoice for use of an Insley backhoe on January 15, 1962, but Houck's time sheet reported that such a piece of equipment was used that day by Pioneer. Houck proceeded to testify concerning various dates on which, as disclosed by his time records, the Insley backhoe was used by Pioneer but invoices and transmittals showed its use on such dates by other companies.

Floyd Houck, the official timekeeper, testified that he worked at a desk near Mrs. Maley and "if anyone else would have turned in time, I think I would have known about it." He further testified as follows in reference to the time sheets:

"Mrs. Maley a lot of times was present when I came in with the sheets, she visited the field many

times herself, she may be in the field when I came in. * * *

"Many times she was around my desk, we were in conversation, maybe I handed them to her or maybe I put them on her desk."

Richard Wolfe, a witness for the defendant, testified that, during the period of time here in question, he was employed in the Department of Commerce in connection with the flood disaster program "as bookkeeper or something similar to that nature, as a clerk or supervisor in the office"; and that he processed transmittals for payment. In reference to preparing transmittals, he stated: "* * * Now, on the equipment, on their invoices, which was billed on an hourly or contract basis, you checked against the timekeeper's record." He further testified that if invoices did not come directly to him, they came to his supervisor, Mrs. Maley. He made it clear that, in preparing transmittals, he was careful to check and to determine that invoices submitted corresponded with the timekeeper's records, and that generally when invoices came to Mrs. Maley, they were sent to him and, after he checked them, he sent them back to her. It is clear from his testimony that the timekeeper's records formed the basis for determining the genuineness and accuracy of invoices and for preparation of transmittals. Mr. Wolfe testified further that the timekeeper turned his records in to him or to Ruth Maley; that if an invoice had come to his attention in the name of a company not shown on the timekeeper's records, he would have disallowed it, and taken it to Mrs. Maley; and that every discrepancy in invoices was brought to her attention. On redirect examination, he was asked the following questions and gave the following answers:

"Q. Were there other persons besides Mrs. Maley who could have prepared transmittals?

"A. Not on that account, there shouldn't have been.

"Q. What account?

"A. The funds these bills came through, came out of, came through our department, if somebody else would prepare a transmittal, it wouldn't be paid out of that fund."

On cross-examination, the following testimony was elicited:

"Q. Mr. Wolfe, Mrs. Maley, as your boss, had the job and duty to see that these transmittals and the invoices were correct, and that the proper people were getting paid for the proper work and equipment they furnished, is that not true?

"A. That is true.

"Q. Although you worked under her, that was her job and her duty?

"A. I just carried out some of her responsibilities she laid down for me."

While it is true that the transmittal sheets were, in the usual course, actually typed by some person or persons employed for work of that character, it appears that such persons worked under Ruth Maley's direction. Mr. Wolfe, in his testimony, makes it abundantly clear that he did not prepare any transmittals in the name of any company except in accordance with the timekeeper's records.

The jury was warranted in finding from the evidence beyond a reasonable doubt that the timekeeper's records formed no basis for invoices or transmittals in favor of H. Lacey Company, Belich Construction Company or Stanton Construction Company; that only Ruth Maley and Richard Wolfe, under her direction, had the duty and responsibility of preparing transmittals; that Richard Wolfe prepared no transmittals except in harmony with the timekeeper's records; that transmittals would not be honored for payment unless they came through proper channels from Mrs. Ma-

ley's office; that false transmittals were prepared and received by the State Auditor; and that on the basis of the false transmittals, state warrants were issued to companies, real or fictitious, which were not entitled to payment from the public funds on which such warrants were drawn.

Ruth Maley, testifying in her own behalf, was evasive and reluctant. Her recollection was faulty in relation to facts which the jury reasonably could have believed she should have remembered or concerning which she should have informed herself or refreshed her recollection prior to the trial. When asked concerning James Stuckey's testimony to the effect that she requested that invoices be submitted in names of persons or firms other than Pioneer, she replied: "I might have talked with Mr. Stuckey, I don't think I did, but I might have, and I don't remember it." When asked to state to the best of her recollection what she knew concerning any statement she made "with regard to billing this in the name of other people," she replied:

"A. This is the way I remember it, I will tell it as clearly as I can. I talked with someone, I can't say it was Mr. Stuckey, I may have talked to more than one, but we had complaints from some of our field people that had come in, I don't know which ones, and we had also had some phone calls into the Governor's office and into the Department, relative to the fact that Pioneer Construction Company had a great amount of equipment which didn't belong to them.

"We also had a complaint that a man said he subcontracted something to them, and didn't get paid. Whoever I talked with, I said, 'If you people have subcontractors, why don't you let your subcontractors bill us, we would like to know the true state of accounts, who has this equipment, who does it belong to.'

"That is all I said, it wasn't an order, it was a suggestion, I was trying to eliminate future criticism in the project."

As I understand her testimony quoted immediately above, she admitted that she had suggested that invoices for work done by Pioneer be submitted in names other than Pioneer's. This practically amounts to an admission of her guilt of the charge contained in the indictment. It tends to confirm testimony of Mrs. Bass and Mr. Stuckey to the effect that, for some reason, she required that some of the invoices for work done by Pioneer be submitted in names of others. Ruth Maley seems to have admitted in her testimony that she suggested that invoices for work done by Pioneer be submitted in names of Pioneer's subcontractors. This was obviously for the purpose of forming a basis for preparation of false transmittals and the consequent issuance of state warrants to companies, real or fictitious. Testimony to this effect establishes a motive on Ruth Maley's part for preparation of false transmittals in order to conceal the true state of facts. It does not appear that any other persons in her division of the Department of Commerce were conscious of a need or reason for concealing the true state of facts.

Ruth Maley's testimony relative to Pioneer's alleged subcontractors is wholly incredible. It does not appear that anybody other than Ruth Maley anywhere at any time believed or even suspected that Pioneer had subcontracted a part of its work to Belich Construction Company, Stanton Construction Company or H. Lacey Construction Company. It ill behooves her to predicate her defense on such a flimsy, incredible basis, inasmuch as she frequently went to the field to inspect the work, inasmuch as the official timekeeper's records were constantly available to her, and, above all, inasmuch as she was charged with the duty and responsibility to be informed in relation to such matters. In any event, it is a matter of little moment whether Pioneer was merely leasing equipment from

other companies or subcontracting portions of its work to such other companies because, in either event, such companies were not entitled to be on the state's payroll or to be paid directly from state funds. The fact remains that Ruth Maley suggested, according to her testimony, or required, according to the testimony of Mrs. Joyce Bass and James Stuckey, that invoices for work done for Pioneer be submitted in the names of others. This in itself was improper and illegal and could have had no reasonable or conceivable purpose other than that of forming a basis for false transmittals and consequent improper state warrants, in order to ''conceal the true state of said written accounts.''

The majority opinion states that Richard Wolfe, a witness for Ruth Maley, testified that both he and she, and also persons working under him, checked time records. In relation to checking invoices, Wolfe also testified: ''Well, she should know—she knew who was out there in the field, I don't know, I knew what was on the time sheets when the reports came in.'' Wolfe further testified, his testimony having been quoted previously in this opinion, that there should not have been anybody other than Ruth Maley and himself who could have prepared transmittals for payment from these flood relief funds, and that she ''had the job and the duty to see'' that the transmittals and invoices were correct, and that the proper people were getting paid for the proper work and equipment they furnished.

I believe it appears clearly from the record that, while others actually typed transmittals, only Richard Wolfe and Ruth Maley had the duty and authority to approve invoices. Richard Wolfe testified that he never approved any invoice at any time which was not ''backed up by the State time records.''

It is unmistakably clear from the record that Ruth Maley either suggested or required that invoices for work done by Pioneer be submitted in names of others

and it is not becoming of her to rely upon the implication or "hypothesis" that she or some other person in her office was misled by such false invoices and, as a consequence, in good faith prepared and approved transmittals based on the false invoices which she thus caused to be prepared.

The majority opinion, in the first point of the syllabus and elsewhere, implies that the state's case against Ruth Maley is based "on circumstantial evidence alone." This is utterly without foundation, in fact or in law. While a witness in her own behalf, she admitted that she had suggested that invoices be prepared in the names of Pioneer's subcontractors. James Stuckey testified that Ruth Maley "suggested that the bills would have to be billed through other people rather than a lump sum bill, *she* couldn't approve an invoice over five thousand dollars." (Italics supplied.) Mrs. Joyce Bass testified that, after difficulty arose concerning invoices prepared by her, she talked with Ruth Maley and "told her what piece of equipment she had on each invoice, and the amount of time, and she said it was O. K., or something of that nature." She testified further that companies she mentioned to Ruth Maley in that connection included "The H. Lacey Company and Stanton Construction." All this was direct, rather than circumstantial, evidence. Much of the state's evidence is circumstantial, but none is as cogent as the direct evidence briefly summarized immediately above. I believe, therefore, that, to the extent that the majority opinion is predicated on the proposition that Ruth Maley's conviction is based solely on circumstantial evidence, it is patently erroneous.

To the extent that the conviction was based on circumstantial evidence, the circumstances were firmly established by unimpeachable documents and by testimony of witnesses whose credibility, so far as the record discloses, is not questioned. Even if all the evidence were regarded as circumstantial, I believe the conviction is fully justified. In a decision upholding a

conviction of a charge of murder, this Court stated a well settled legal proposition as follows: "A person charged with crime may be convicted on circumstantial evidence alone, * * * and, * * * such evidence is not only competent but is sometimes the only mode of proof in criminal cases." *State v. Sheppard,* 49 W. Va. 582, pt. 19 syl., 39 S. E. 676. Circumstantial evidence may be as strong as direct evidence. *Butler v. Smith's Transfer Corp.,* 147 W. Va. 402, pt. 5 syl., 128 S. E. 2nd 32.

The general rule, subject to minor exceptions not material in this case, is that rules of evidence are the same in both civil and criminal cases, except as to the difference in the degree of proof required in the two types of cases. A jury or a court is not bound to accept oral testimony, even though uncontradicted, if it is incredible or where circumstances controvert it. *Smith, Admr. v. Edward M. Rude Carrier Corporation,* 151 W. Va., pt. 4 syl., 151 S. E. 2d 739; *Lusher v. Sparks,* 146 W. Va. 795, pt. 6 syl., 122 S. E. 2d 609; and other cases cited in 146 W. Va. at page 809 and 122 S. E. 2d at 617; *Raines v. Faulkner,* 131 W. Va. 10, 17-18, 48 S. E. 2d 393, 398. "The jury is not bound to accept uncontradicted testimony when there are circumstances which controvert it." *Watson v. Burley,* 105 W. Va. 416, pt. 1 syl., 143 S. E. 95, 64 A.L.R. 839; *Webb v. Harrison,* 127 W. Va. 124, 130-31, 31 S. E. 2d 686, 689. "A well connected train of circumstances is as cogent of the existence of a fact as any array of direct evidence, and may outweigh opposing direct testimony; and the concurrence of well authenticated circumstances has been said to be stronger evidence than positive testimony unconfirmed by circumstances." 32A C.J.S., Evidence, Section 1039, pages 751-53. The reports of the decisions of this Court abound in cases upholding convictions of persons on charges of crime which were based partly or wholly on circumstantial evidence.

The majority opinion cites some of the many decisions of this Court which circumscribe the power of a court to set aside a jury verdict in a case such as this, but the mere citation of such cases accomplishes little unless we obey their command and the duty they enjoin upon us.

I believe the verdict of the jury is abundantly supported by the evidence. I would, therefore, affirm the judgment of the trial court and uphold the jury's verdict.

I am authorized to state that Judge Berry concurs in this dissenting opinion.

BERRY, JUDGE, concurring in the dissenting opinion:

I concur in the dissenting opinion written by Judge Calhoun and filed in this case but I wish to add a few comments on the legal effect of the majority opinion. The evidence quoted by him from the record of the trial, in my opinion, makes it crystal clear that the case was one for jury determination, and the verdict of the jury was justified.

The majority opinion is based on the premise that the evidence upon which the jury's verdict was returned was circumstantial alone. This is not correct as clearly shown by the evidence in the record and therefore the authorities used by the majority to sustain their position in this case are not applicable and the disposition is therefore without legal support or justification. It is true that no witnesses testified that they saw the defendant personally type or have typed the transmittals in the name of companies which did not do the work in question, but there is direct evidence that the defendant knew that the work was done by the Pioneer Construction Company and requested that the invoices for such work which had been first properly submitted in the name of the Pioneer Construction Company be resubmitted in the names of other companies which did not do the work. The only oth-

er person who supervised the preparation of transmittals of invoices denied that he prepared any such falsifications as were shown to have been submitted. There is direct evidence that the defendant knew what company did the work because she had been on the ground and had kept some of the time herself. In other words, there is direct evidence that the defendant first suggested the falsifications and later was solely responsible as a supervisor for the submission of the invoices and transmittals concealing the true state of the account regardless of who might have prepared them routinely as a typist.

It is also true that the defendant denied some of the testimony offered by the state in connection with the matter related above, but this in itself makes the question one for the jury to determine.

The defendant and one other person distributed or approved the distribution of time charges which became the invoices on which the transmittals rested, and that other person denied complicity; it then became a jury question as to whether defendant's denial prevailed against the strong evidence that she was the one responsible.

The majority opinion means that notwithstanding all of the evidence introduced by the state directly indicating the guilt of the defendant of the charge contained in the indictment, the trial court at the conclusion of all the evidence should have directed the jury to return a verdict of not guilty, because some of the evidence indicated that some person other than the defendant may have routinely prepared the transmittals showing the work done by companies other than the Pioneer Construction Company, which actually did the work. This is clearly an invasion of the province of the jury and such disposition cannot be justified under the law governing such matters and no legal authority warrants such action.