STATE OF WEST VIRGINIA

*v.*

JACK A. NUCKOLS

(No. 12672)

Submitted September 25, 1968. Decided December 17, 1968.

Petition for rehearing filed January 16, 1969.

Rehearing refused March 11, 1969.

738

Preiser, Greene & Hunt, Stanley E. Preiser, and L. Alvin Hunt, for plaintiff in error.

C. Donald Robertson, Attorney General, Leo Catsonis and Morton I. Taber, Assistant Attorneys General, for defendant in error.

BERRY, PRESIDENT:

This is an appeal by Jack A. Nuckols, a former Commissioner of Motor Vehicles of West Virginia, hereinafter referred to as defendant, from a final judgment of the Circuit Court of Kanawha County, West Virginia, of November 23, 1966, which affirmed a judgment of the Intermediate Court of Kanawha County of April 12, 1966, convicting him of falsifying state accounts, in violation of the provisions of Code, 61-3-22. After the defendant's conviction by the jury in the Intermediate Court of Kanawha County he was sentenced by said Court for a term of from one to ten years in the West Virginia State Penitentiary. The case was submitted on arguments and briefs for decision of this Court at the September Regular Term, 1968.

The charges against the defendant can be divided into three categories: (1) Alleged employees of Department of Motor Vehicles put on payroll by defendant but who did little or no work for the State, (2) false expense accounts filed by the defendant, and, (3) improper purchase of gasoline on state credit cards for personal use in his auto-

mobile and airplanes not owned by the state while neither was being used by the state in its business.

The proof of these charges resulted in a complicated case requiring about 200 exhibits of various personnel cards, payroll sheets, expense accounts, transmittal sheets, gasoline purchases sheets, and related papers which were stated to have been prepared by or under the direction of the defendant, approved by him and transmitted to the state auditor who in turn issued state warrants or checks on the state treasurer who designated the paying bank with proper signature, after which they were delivered to the Department of Motor Vehicles and were then cashed and the money obtained thereby either kept by the defendant or delivered to others who were not legally entitled to such money.

The lengthy evidence introduced during the trial will be discussed in more detail under the various assignments of error, but briefly it was to the effect that certain persons were on the payroll of the Department of Motor Vehicles and were doing work of a nature not included in the positions to which they were assigned and designated on their personnel record. Other persons were on the payroll of the Department of Motor Vehicles who were never present in the Motor Vehicles Offices; in most instances these persons were unknown to anybody in authority except the defendant, had not been seen by supervisors and did no work in the various departments and divisions to which they had been designated and assigned which was shown by the testimony of the various department and division heads. The evidence of the state was to the effect that these employees were placed on the payroll at the direction of the defendant and their payroll transmittals were signed and certified by him.

Evidence was introduced of expense accounts transmitted by the defendant for mileage, meals and expenses for various dates and various places with added evidence to the effect that on the same dates the defendant was actually at different places as shown by other expense accounts and gasoline purchased for state cars. There was further

741

testimony that travel expense, meals, lodging and expenses for gasoline in some instances were claimed by the defendant and payments made therefor to him by the state when he was on personal business, and that gasoline purchases were charged by him to the Department of Motor Vehicles on Humble Oil Company credit cards for cars and airplanes when the evidence indicated the trip was a personal one.

The defendant's evidence was to the effect that he had the right to employ the people in question and have them placed on the state payroll; that he used them for state business; that on trips to Florida, Colorado, etc. he did some work in connection with his state position; and that there was a logical explanation, which he gave for the apparent duplicitous travel vouchers and state car charges. He stated further that he did not charge gasoline for his personal use or approve duplicate charges made for gasoline.

The evidence with regard to those matters was disputed and is in conflict, which, therefore, presented a question for jury determination.

Numerous pleadings and motions were made during the course of the proceedings in this case and they resulted in a wide variety of errors being assigned. There were twenty-one assignments of error contained in the defendant's petition, many of which were duplicitous, and the voluminous brief of the defendant relied on twelve assignments in the argument contained therein, of which some were repetitious so that these assignments can be reduced into the following classifications: (1) Improper selection of both the grand jury and the petit jury, (2) the return of an indictment against the defendant which was not sufficient in law and the furnishing of insufficient bills of particulars upon motions of the defendant, (3) the refusal to grant a continuance, (4) improper arraignment of the defendant, (5) the failure of the record to show the presence of the defendant at all stages of the trial, (6) the admission of improper evidence and improper examination of character witnesses, (7) the giving of improper instruc-

tions on behalf of the state and the refusal to give proper instructions offered by the defendant, and, (8) the refusal of the trial court to direct a verdict in favor of the defendant and to grant his motions for an arrested judgment and for a new trial.

The assignment of error most strongly relied upon was that relating to the selection and the drawing of the grand jury and petit jury involved in the indictment and trial of this case, and evidence was introduced by the defendant by avowal to show an improper manner of selection.

It should be noted that the defendant did not raise the question of the improper selection of the grand jury and petit jury or present evidence thereon until after the trial and his conviction by the jury. These matters should be raised by a plea in abatement before the trial at which time evidence is introduced in order to ascertain whether or not the juries were properly selected. In such cases if it is shown by the evidence introduced at the hearing on plea in abatement that a jury was improperly selected it would dispense with the time and expense of a trial. *State ex rel. Mynes* v. *Kessel,* 152 W. Va. 37 (Decided by this Court January 23, 1968), 158 S. E. 2d 896; *State* v. *Hankish,* 147 W. Va. 123, 126 S. E. 2d 42; *Custis* v. *Commonwealth,* 87 Va. 589, 13 S. E. 73; *Robinson* v. *Commonwealth,* 88 Va. 900, 14 S. E. 627. This procedure applies to both grand juries and petit juries and is clearly set out in point 2 of the syllabus in the case of *State* v. *Hankish, supra,* wherein it is stated: "The proper method of challenging, before the trial of a case, alleged irregularities in the selection, drawing, or impaneling of jurors, is by plea in abatement." It was also held in point 3 of the syllabus in the *Hankish* case that: "A verdict will not be set aside for any irregularity in drawing, summoning or impaneling a jury unless properly objected to before the swearing of the jury or unless it is shown that the party making the objection was injured thereby."

Inasmuch as this question was not timely or properly raised, the trial court refused to allow the defendant to introduce evidence with regard to the selection of the jury

but did allow an avowal in the record as to the selection of the juries by inserting the testimony taken at the pre-trial hearing in another criminal case relating to the grand jury and petit jury at the September, 1965, Term of the Intermediate Court of Kanawha County. This present case was tried with the same levy term list of jurors. Other evidence related thereto was also allowed to be introduced in the record as an avowal. It is the contention of the defendant that if the jury was selected in an improper manner the indictment is void and such matter can be raised at any time.

In order to understand the problem relating to the procedure for the selection and drawing of the juries, the statute provided for such selection of the grand jury, Code, 52-2-2, as amended (which, with the exception of the number of jurors selected and their qualifications, is almost the same as another statute for the selection of the petit jury), will be quoted verbatim:

"The jury commissioners appointed under the provisions of section three [§52-1-3] of article one of this chapter shall select and draw persons for grand juries. Such commissioners shall, at the levy term of the county court each year, and at any other time when required by the court which appointed them, or the judge thereof in vacation, prepare a list of not less than one hundred nor more than two hundred qualified persons of their county for grand jury service, chosen from the respective magisterial districts thereof, as nearly as may be in proportion to the population of the districts. The lists so prepared shall be submitted to the clerk of the court authorized to impanel a grand jury, or the judge thereof when required, and the name of any person who is not qualified shall be stricken from the list by the clerk or judge. The persons so listed shall be of good moral character, who have never been convicted of a felony or of any scandalous offense; and shall have been bona fide citizens of the State and county for at least one year immediately preceding the preparation of the list, and shall not be officeholders under the laws of the United States or of this State. At the time such jury list is made up, the jury commissioners shall

cause all the names thereon to be written, each on a separate ballot, and shall fold, roll or prepare the same so as to resemble each other as nearly as may be, and so that the name written thereon shall not be visible on the outside, and shall inclose the ballots for each magisterial district in a separate envelope indorsed with the name of the magisterial district and the number of ballots inclosed, and shall deposit all the ballots, with the list, in a secure box to be prepared for the purpose, which shall be delivered to and safely kept by the clerk of the circuit court, and shall be known as the 'grand jury box' and shall be opened only by the jury commissioners or by order of the judge of the court having control thereof."

This statute provides that the two jury commissioners shall at the levy term of the county court select between one hundred and two hundred names of qualified jurors from and in proportion to the population of the magisterial districts of the county, submit this list to the circuit clerk and shall "cause" the names to be written on separate "ballots" which are folded so that the names cannot be seen and enclose these slips in envelopes each containing the jurors from a magisterial district with a number on the outside indicating how many are in it, and shall deposit these envelopes with the master list in a secure box to be kept by the clerk and opened only by the commissioners.

Code, 52-2-3, as amended, provides that before each term of court sixteen grand jurors shall be drawn by the commissioners from the envelope in proportion to the number on the outside with at least one from each envelope. Code, 52-1-4, as amended, and 5 and 6, relate to the selection of the petit juries by similar provisions except as to the number on the list which is between two hundred and one thousand and not less than eight hundred for a populous county such as Kanawha. It appears from the evidence that the two commissioners did not formally meet to make up the list but each made up his own list of about half of the required number, gave or mailed this to the clerk who combined the names into a master list and returned the master list to the commissioners who each checked the list and assured himself that the names he submitted were

on it, unless some were omitted as being unqualified. The commissioners then met with the clerk who had the ballots prepared and they either helped with or observed the process of placing them in the envelopes with an effort being made to do so proportionately, and in their presence these envelopes were placed in a locked box to which the clerk had a key and kept that key with his cash so that it would be placed in a safe place. When the time came for drawing the juries the commissioners and the clerk did get together and the evidence is not clear as to just which one of them opened the box, took out the envelope and drew the names which the clerk then recorded. There is some indication that this process was participated in by all three of them. However, it was always done in the presence of and under the supervision of the commissioners. The clerk testified that generally the commissioners performed these duties and that he did not recall doing it himself. The defendant contends that since the statute relating to juries uses the words "shall cause" in relation to the writing of the names on the ballots, but uses the term "shall" in relation to what is done with the ballot, that while they might have someone else under their direction write the names on the ballots they must personally fold the ballots and put them in the envelope and perform other duties personally.

It should be pointed out that no contentions whatsoever are made by the defendant that this alleged informal procedure in which the clerk did some things that might have been done by the commissioners was in anyway fraudulent or caused any prejudice to the defendant. The defendant's contention about the improper selection of the juries rests solely on the proposition that the steps enumerated in the statute are in most instances mandatory and cannot be done by anyone other than the jury commissioners. It has been repeatedly held that all of the steps in the selection and drawing of both grand juries and petit juries by the jury commissioners are directory except the preparation of the jury list which is mandatory. *State* v. *Carduff*, 142 W. Va. 18, 93 S. E. 2d 502; *State* v. *Gory*, 142 W. Va. 5, 93 S. E. 2d 494; *State* v. *Curotz*, 142

746

W. Va. 45, 93 S. E. 2d 519; *State* v. *Cirullo*, 142 W. Va. 56, 93 S. E. 2d 526; *State ex rel. Mynes* v. *Kessel*, 152 W. Va. 37, 158 S. E. 2d 896.

The time the lists are to be prepared, the numbers contained thereon, and other procedures in the selection of juries are merely directory, and substantial compliance with the statute is all that is required. This principle is clearly set out in syllabus point 2 in the case of *State* v. *Carduff, supra*, in the following language: "The provision of Section 2, Article 2, Chapter 52, Code, 1931, that the jury commissioners 'shall, at the levy term of the county court each year, and at any other time when required by the court which appointed them, or the judge thereof in vacation, prepare a list of not less than one hundred nor more than two hundred qualified persons of their county, for grand jury service,' in requiring the preparation of such list, is mandatory and strict compliance with that requirement is essential to the selection of a lawful grand jury, but, in specifying the time at which such list is to be prepared and the maximum number of qualified persons whose names are to be placed upon it, the provision is directory and substantial compliance with those requirements is sufficient in the selection of a lawful grand jury." This same principle was approved and contained in syllabus point 3 of the case of *State* v. *Gory, supra.*

The most recent case decided by this Court (1968) is that of *State ex rel. Mynes* v. *Kessel, supra.* This case cites with approval the former cases dealing with the question and held in syllabus point 2 that:

"The provision of Section 2, Article 2, Chapter 52, Code, 1931, as amended, that persons selected and drawn for grand juries shall be chosen from the respective magisterial districts as nearly as may be in proportion to the population of such districts, and the provisions of such section that at the time the list of persons for grand jury service is made up, the jury commissioners shall cause all the names thereon to be written, each on a separate ballot, and shall fold, roll or prepare the same so as to resemble each other as nearly as may be, and

so that the names written thereon shall not be visible on the outside, and shall inclose the ballots for each magisterial district in a separate envelope indorsed with the name of the magisterial district and the number of ballots inclosed, and shall deposit all the ballots, with the list, in a secure box to be prepared for the purpose, which shall be delivered to and kept safely by the clerk of the circuit court, and shall be known as the 'grand jury box' and shall be opened only by the jury commissioners or by order of the judge of the court having control thereof, most of which provisions deal with and prescribe the procedure to be followed in the use of such list and ballots, are directory; and a grand jury drawn from such list and in the selection of which the foregoing provisions are substantially complied with, is a lawful grand jury and an indictment by such grand jury is not vitiated or rendered void because there has not been strict compliance with such directory provisions, if the members of such grand jury are qualified for grand jury service and no fraud or corruption has occurred in and no prejudice to any right of the defendant has resulted from the manner in which such grand jury was selected and impaneled."

The law governing the selection of grand juries is also applicable for petit juries because as heretofore stated, selections are made in the same manner. *State* v. *Huff*, 80 W. Va. 468, 92 S. E. 681; *State* v. *Hankish*, 147 W. Va. 123, 126 S. E. 2d 42. Some confusion arose with regard to the matter of the preparation of a jury list for petit jurors as the result of certain language in the *Huff* and *Curotz* cases indicating that each of the steps in selecting the juries and the preparation of the lists was merely directory. Judge Haymond's concurring opinion in the *Curotz* case calls attention to this inconsistency and the case of *State* v. *Gory, supra,* clearly refers to the matter and indicates that the selection of the jury lists is mandatory. The evidence in the instant case which was introduced by avowal after the trial clearly shows that the jury lists for both the grand jury and petit jury were prepared by the jury commissioners in accordance with the mandatory requirements of the statute. No one else prepared the lists. Each prepared one-half of the number of jurors in each instance

and each was given a master list of all the jurors submitted by both jury commissioners which was approved as to the names of the jurors contained thereon by both of the jury commissioners, which is certainly a clear compliance with the statute. The other procedures being merely directory and there being no charge nor contention that the jury list was not properly selected by the commissioners, nor that there was fraud in connection therewith, nor that the defendant was injured in any manner by the method of selection or procedure of the grand jury that returned the indictment or the petit jury which returned the verdict of guilty, there is no merit to the assignment of error in connection with this matter.

The contention of the defendant that the grand and petit juries were improperly constituted because of a conflict in Code, 52-2-3, with regard to the selection of men for the grand jury and Article III, section 21 of the Constitution providing that all persons regardless of sex will be eligible to serve on both the petit and the grand jury as well as the manner of swearing of the grand jury, is without merit. The word "men" in Code, 52-2-3, is merely descriptive and in all other places it refers to the drawing of the names of persons for the grand jury in conformance with the language used in Article III, section 21 of the Constitution and must be read in connection with the provisions of the Constitution relating to jury service.

The word "oath" in this state includes both swearing and affirming and does not violate the First and Fourteenth Amendments to the Constitution of the United States with regard to the religious aspect. Code 2-2-7. No indictment in this state is invalid for the failure to show that it was returned upon the oath or affirmation of the jurors. Code, 62-2-10.

The next assignment of error is the contention that the indictment and bills of particulars did not sufficiently inform the defendant of the offense with which he was charged.

The demurrer was overruled and two bills of particulars were furnished to the defendant listing in detail the names,

places or number of all alleged falsifications mulcting the state. The demurrer was based on the ground that the indictment included several offenses, such as making of false entries to conceal a true account, the doing of such action to defraud the state and to enable or assist others to get money they were not entitled to. Also, the defendant urges that inasmuch as the indictment alleges the causing of things to be done, this resulted in confusion of questions as to whether the defendant should have been indicted as principal, aider or abettor, or accessory. Apparently, it is the contention of the defendant that there should be separate indictments as to these phases.

The indictment is in the words of the statute and the gist of the offense in its many facets is the intent to conceal the true state of any account or to defraud the state or to do the acts with intent to enable or assist any person to obtain money to which he was not entitled. The charging part of the indictment was that the defendant "* * * did unlawfully and feloniously make and cause to be made false entries in written accounts kept by the State of West Virginia by preparing and submitting, and causing to be prepared and submitted false personnel cards, false payroll sheets, false expense accounts and false transmittal sheets in writing to the Auditor of the State of West Virginia, which said false personnel cards, false payroll sheets, false expense accounts and false transmittal sheets were kept by the said State of West Virginia with intent in so doing to defraud the State of West Virginia and to assist said Jack Nuckols and other persons to obtain money to which they were not entitled and to conceal the true state of said accounts, * * *". The defendant got not only one bill of particulars but two listing all of the transactions involved in the alleged falsification as well as the numbers of state warrants and amounts of the falsified transactions. The second bill of particulars listed in detail the five persons who, assisted by the defendant, obtained money to which they were not entitled. If the language of the statute upon which an indictment is based clearly informs the defendant of the character and cause of the crime of which

he is charged it is sufficient if the language of the indictment substantially follows the language of the statute. *State of West Virginia* v. *Johnson*, 134 W. Va. 357, 59 S. E. 2d 485. This principle is succinctly stated in the second point of the syllabus of that case wherein it is stated: "An indictment is generally sufficient if it follows the language of the statute creating the offense charged, and it ordinarily need not allege the mode or manner of the commission of the offense." Similar indictments drawn for offenses under the same statute as the case at bar under Code, 61-3-22, have been in effect held sufficient in three recent cases. *State ex rel. Brown* v. *Thompson*, 149 W. Va. 649, 142 S. E. 2d 711; *State* v. *Maley*, 151 W. Va. 593, 153 S. E. 2d 827, and *State* v. *Dandy*, 151 W. Va. 547, 153 S. E. 2d 507. It was held in the *Brown* case that the indictment did not fail to inform the petitioner fully of the charges against him. In the *Maley* case a motion to quash the indictment and a joint demurrer were overruled and the assignments of error relating to these preliminary questions were found to be without merit. An indictment in practically the same language was returned in the *Dandy* case and the sufficiency thereof was apparently not seriously relied on in the assignments of error. Certainly the defendant was fully informed of the character and cause of the crime for which he was charged in both the indictment and bills of particulars furnished to him because he attempted to answer or explain each and every item contained in the indictment or bills of particulars. There is no merit to the contention that there should have been three indictments, since the matters referred to all related to the same thing, the obtaining of money improperly from the state by devious schemes. The statute under which these indictments were brought is the only law governing such offenses by employees of the state and without such statute there would be no control or prosecution of stratagems to defraud the state in such cases. Code, 61-3-22.

The next assignment of error is the refusal of the trial court to grant to the defendant a continuance. This motion was made on the day of the trial and was based on the other contention of the defendant that he was not advised

of what he was charged with. This is the same contention made in connection with his assignments of error relating to the indictment and bills of particulars and is without merit. *State* v. *Riley,* 151 W. Va. 364, 151 S. E. 2d 308. It was held in point 2 of the syllabus in that case that: "The granting or denial of a motion for a bill of particulars, or a motion for a continuance, rests in the sound discretion of the trial court, and unless it appears that such discretion is abused the ruling of the trial court will not be disturbed."

It is the contention of the defendant in the next assignment of error that there was no proper arraignment of the defendant. This assignment of error was not presented to the trial court in the motion to set aside the verdict and the trial court never had the opportunity to rule on this matter. The record clearly shows that the defendant was present in court and entered his plea of not guilty. The order was entered in the order book on February 7, 1966, in the following language: "Jack Nuckols, who stands indicted for felony, this day appeared in Court in answer to his recognizance heretofore entered into, and by Samuel D. Lopinsky and Orville Hackney, his counsel, and thereupon for plea in this behalf the defendant in *proper person* and by Samuel D. Lopinsky and Orville Hackney, his counsel, *pleads not guilty * * *".* [Emphasis supplied]

A court of record speaks only by its records and the record in this case shows that the defendant pleaded in person, and it cannot be argued that the plea was entered by his attorney. *State ex rel. Mynes* v. *Kessel, supra; Cottrell* v. *Commonwealth,* 187 Va. 351, 46 S. E. 2d 413. Then, too, it has been held that where an order recites the appearance of the defendant in discharge of his recognizance at the time the jury was selected for the trial of the case it is sufficient to show his presence in court and in his own proper person in his trial. *State* v. *Yoes,* 67 W. Va. 546, 68 S. E. 181.

It appears to be the contention of the defendant that no separate order signed by the judge relating to a plea of not guilty was found in the court file although it appears that

it was recorded by the clerk in the order book which was signed by the judge after the end of the day's proceeding. Even if in a criminal case, which is a law case, there may be orders sometimes prepared by the attorneys on sheets of paper and signed by the judge, these are not the official orders but advise the clerk what to put in his bound book. The official orders in a criminal case are orders inserted in the order book by the clerk and later signed by the judge as part of a day's proceedings in accordance with Code, 51-3-4, as amended, and they must be recorded in the order book before they can become part of the record of the court. This order was properly recorded in the instant case. *State ex rel. Mynes* v. *Kessel, supra; Weatherman* v. *Commonwealth*, 91 Va. 796, 22 S. E. 349.

The assignment of error that the defendant was not present throughout the trial was also not raised in the motion to set aside the verdict in the trial court. The statute and the decided cases in this state require that a defendant be personally present during every stage of his criminal prosecution in felonies. Code, 62-3-2. *State* v. *Howerton*, 100 W. Va. 501, 130 S. E. 2d 655; *State* v. *Vance*, 146 W. Va. 925, 124 S. E. 2d 252. However, the record shows that the defendant was present at the different important stages of the trial; namely, at the discharge of his recognizance in entering his plea of not guilty, at the overruling of the motion for continuance, during the selection of the jury, as well as other occasions during the trial, when the verdict of the jury was returned and when he was sentenced by the court. There is a presumption, in the absence of any showing in the record to the contrary, that the defendant is present throughout the proceedings of his trial when the record indicates that he was present at the beginning of different stages, and the reporter does not have to keep repeating a statement every few lines that he is still present. Reasonable inferences that he was present may be drawn from the record. *State* v. *Lemon*, 84 W. Va. 25, 99 S. E. 263; *Williams* v. *Commonwealth*, 93 Va. 769, 25 S. E. 659; *Hampton* v. *Commonwealth*, 190 Va. 531, 58 S. E. 2d 288. The burden rests upon the defendant to show affirmatively from the

record that he was not present during every stage of his trial, and this has not been done in the case presented here. *Rollins* v. *Daraban*, 145 W. Va. 178, 113 S. E. 2d 369; *State* v. *Lemon, supra.*

It will be necessary to discuss certain evidence dealing with the remaining assignments of error classified as 6, 7 and 8. The record is lengthy and complicated with regard to the many financial transactions and it would be unnecessarily burdensome to discuss all of them in detail. They can, however, be explained as in three broad categories, each representing a considerable number of papers filed which produced money or benefit either to the defendant or one of the persons employed by him personally and which would be illegal unless they would be for the benefit of the state in the transactions or relating to business of the state.

The first category is that of personnel working for the benefit of defendant or of themselves with his approval and assistance without producing any benefit to the state. The evidence presented by the state shows the placing on the state payroll of five persons who did nothing for the state. Two of these consist of airplane pilots when the state had no plane for Mr. Nuckols' use. There was no classification or salary provision for these men who admitted they were airplane pilots and employed as such. One of them was placed on the payroll as a reviewing officer and later as a clerk. The other pilot was placed on the payroll as an investigator or examiner. Neither of them performed any duties in these classifications. The evidence shows that during the time these men were employed, one apparently replacing the other, they piloted Mr. Nuckols or his family on numerous trips to and from the surrounding areas and even to Florida, Nassau, Connecticut and Colorado Springs. Many of these trips, even as explained by the defendant's evidence, obviously were made primarily for personal reasons. A trip to Colorado Springs, made by air, was to pick up a specially constructed jeep for his own personal use, for which purpose he took with him a person on the payroll of the Department of Motor Vehicles to drive it back

to West Virginia. He attempted to justify the trip by saying that he had attended to some official business by talking to and riding with state policemen patroling the highways of Colorado, to get ideas with regard to the West Virginia point system which he had instituted. However, while he claimed to have conferred with numerous persons at numerous places out of the state he was unable to give any details that could be checked. He stated that he had ridden about four hours with one or more state policemen in Colorado and asked him or them about the traffic situation but he was unable to give the description of the uniforms of the policemen or the type of car although it was shown in the state's evidence given by a Colorado official that both were of a distinctive nature. On one of his trips to Florida he claimed that he was making preparation for a meeting of motor vehicle administrators but the counsel for this organization said he had no record that there was to be any such meeting and would have known about such meeting if there had been one. There is evidence that the defendant owned an interest in the Midatlantic Air Service located at the Charleston Airport which was unable to afford the salary of a pilot which was $600 a month so the pilot was paid $75 a month by the Air Service and $525 a month by the state. The pilots did not work for the state in the classification under which they were listed and performed no duties except flying aircraft owned by others than the state.

In continuation of the first category, two women were employed by the defendant and placed on the state payroll but worked at an insurance agency and hearing aid company owned by the defendant and located at 20 Brooks Street in Charleston. The defendant testified that they worked on files of the Motor Vehicles Department at that location but no one else in the Motor Vehicles Department knew anything about it. One of the women made contradictory statements to a state policeman during the investigation of this case as to what her duties were. Another employee placed on the state payroll at the direction of the defendant was a retired state policeman who was the father

of his secretary. This man was placed on the payroll as an investigator but no one in the Motor Vehicles Department ever saw him except the first time he came into the office. The defendant was unable to specifically identify anything he had investigated. He stated that this man would call him over the telephone and make reports and that he never came into the office in Charleston. However, expense accounts were filed by this man regularly for trips from Logan to Charleston and back to Logan from Charleston and were paid by the state. Apparently these expense accounts continued to be filed for quite some time after he was taken off the payroll. It also appears that another person was placed on the payroll of the Department of Motor Vehicles but performed duties of a caretaker near property of the defendant at Flat Top Lake on Flat Top Mountain. This appears to be the same man who was taken to Colorado Springs to drive the specially constructed jeep to Charleston. Some of the airplane trips in which the pilots were used were to Connecticut where a daughter of the defendant attended school to bring her home for the holidays, to fly the defendant and his wife to Florida, to return his wife to West Virginia, and to fly his secretary to Florida on two occasions with him or while he was there. The gasoline for all of these airplane trips was charged on a state credit card and paid by the state.

A second category of false papers relates to the improper use of gasoline credit cards. The evidence indicates that a loosely handled method for the use of gasoline credit cards issued to the state was in effect by leaving a credit card at a filling station located near the capitol building after which purchases made with the use of the credit card were signed by the defendant after many purchases has accumulated. It was then difficult to determine what the purchase was for, and some of them seem to have been for personal cars or personal uses.

The evidence of the state referred to another group of alleged falsified accounts relating to expense accounts filed by the defendant, which constitute the third category of

false papers. Numerous expense accounts were filed by the defendant in which he claimed to have taken automobile trips to distant parts of West Virginia and Virginia at close intervals, sometimes in two different directions on the same day which because of the distance involved would have been extremely difficult. On one occasion he claimed he traveled 465 miles and attended to a number of business matters during the trip. Some of these expense accounts filed by the defendant for expenses while using an automobile were apparently made on the same day he was making airplane trips which would have been practically impossible.

The defendant's explanation with regard to the business he performed for the state on various trips which occurred almost simultaneously is not too clear. Some of them were explained on the ground that other employees had used one car while he was using another on the same trip or at about the same time. On the last day he was in office as commissioner he filed an expense account for a trip to Clarksburg and return but he was seen in the office early in the afternoon. His explanation was that he got up about 5 o'clock in the morning and went to the Ellis Restaurant near Clarksburg and conferred with some truck drivers and then returned to Charleston immediately.

The procedure used in the introduction of evidence during the trial was for the state to prove discrepancies in connection with the falsified accounts and transmittals, and then the defendant offered explanations. It therefore clearly became a matter for jury determination as to which evidence they would believe. This principle has been repeatedly stated by this and other courts dealing with such matters and it is succinctly stated in point 2 of the syllabus of the case of *State* v. *Bailey,* 151 W. Va. 796, 155 S. E. 2d 850, in the following language: "The jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses." Therefore, unless there is some technical error, the various motions relating to the evidence and for a directed verdict were properly overruled.

Errors were assigned regarding instructions but very little discussion was contained in the defendant's brief relating thereto. The validity of the instructions rests in most instances upon the sufficiency of the indictment and evidence relating to the charge or offense contained therein and if they are sufficient and proper the instructions would also be proper.

The final group of assigned errors relates to the improper admission of evidence offered by the state or the refusal to admit proper evidence on behalf of the defendant. One of these assignments pertains to a summary chart or analysis which was prepared by an accountant and which listed numerous transactions in proper order of introduction in order to facilitate the consideration of such matter. It would have been extremely difficult to understand this complicated case without such summary but the defendant objected to it because of the simplification and contended that it was improper evidence. This matter was in the nature of expert testimony or of opinion evidence. The accountant had been properly qualified as an expert to prepare such analysis; and the rule with regard to such testimony is that it is admissible if the witness is shown to be an expert or to have some peculiar qualification and to have more knowledge of the subject than the jury is ordinarily supposed to possess, and that explanatory charts, maps, may be testified from even though not actually introduced as an exhibit. *State* v. *Sibert,* 113 W. Va. 717, 169 S. E. 410; *Lewis* v. *Mosorjak,* 143 W. Va. 648, 104 S. E. 2d 294. Any discrepancies claimed by the defendant would be corrected on cross examination of the witness using the exhibit or his reference material for such purposes. *Burcham* v. *City of Mullens,* 139 W. Va. 399, 83 S. E. 2d 505.

Another assignment of error deals with the using in evidence of an account book which the defendant kept showing his travels and which he gave to an assistant to prepare expense accounts. This account book which defendant failed to retrieve upon leaving office was later turned over to the prosecuting attorney by the other man during the

investigation of the case. The defendant asserts that this is a violation of his constitutional rights by being compelled to give evidence against himself when the account book was turned over to the prosecuting attorney without a search warrant. There is no merit to this contention because the account book was not obtained by the prosecuting attorney by any search procedure. The constitutional provision with regard to search and seizure and warrants therefor applies only to officers and not to private persons. *Sutherland* v. *Kroger Co.,* 144 W. Va. 673, 110 S. E. 2d 716. The use of a log book by one of the pilots during his testimony with regard to certain trips was objected to because the pilot admitted that the entries may not have been accurate because they were not entered each day. However, he was carefully cross-examined with regard to this matter, and the items which were unquestioned were sufficient for the jury to base its conviction upon, and the jury did not need to refer to any inaccuracies for such purpose.

The last assignment of error relates to the cross-examination of several character witnesses who testified on behalf of the defendant. After these witnesses testified that the defendant's reputation was good they were cross-examined as to whether they had heard certain things which would militate against their conclusions. The rule is well established that the credibility of a character witness can be tested by referring to certain things he should have heard that would indicate that the conclusion that the reputation was good was incorrect or not sustained. 58 Am. Jur., Witnesses, Section 658; *Chiccarello* v. *U. S.,* 68 F. 2d 315; *People* v. *White,* 43 Cal. 2d 740, 278 P. 2d 9; *Michelson* v. *United States,* 335 U. S. 469, 69 S. Ct. 213, 93 L. Ed. 168.

For the reasons stated herein, the judgments of the Circuit Court of Kanawha County and the Intermediate Court of Kanawha County are affirmed.

*Affirmed.*