STATE OF WEST VIRGINIA

*v.*

GARY EUGENE FISCHER

(No. 13383)

Decided September 24, 1974.

Dissenting Opinion February 13, 1975.

*Rice, Hannis & Rice, Richard L. Douglas* for plaintiff in error.

*Chauncey H. Browning*, Attorney General, *Richard E. Hardison*, Deputy Attorney General for defendant in error.

CAPLAN, CHIEF JUSTICE:

This case is before the Court upon a writ of error to a final judgment of the Circuit Court of Morgan County entered on September 18, 1972, wherein, upon a finding of guilty by a jury, the defendant, Gary Eugene Fischer, was committed to the custody of the West Virginia Commissioner of Public Institutions to be assigned to a forestry camp for a term not to exceed two years. The aforesaid commitment resulting from an indictment returned by the grand jury for the Circuit Court of Morgan County in which the defendant was charged with the crime of burglary.

In the indictment it was charged that Gary Eugene Fischer, the defendant, on a day in August, 1972, in the nighttime, feloniously and burglariously entered the dwelling house of Frederick Dhyse with the intent to "take, steal and carry away" certain goods and chattels.

It appears from the record that during the investigation of the burglary, William Clark, Sheriff of Morgan County, interrogated Terry Stinebaugh who readily admitted his participation in the crime. Stinebaugh willingly signed a statement wherein he related the details of the burglary and therein named the defendant as one of the participants in the crime.

Testifying at the trial, Stinebaugh related that on the night in question, after having consumed a considerable amount of an alcoholic beverage, he went to the community of Capon where he met one Danny Farris and "this guy named Pug." His testimony in relation to whom he met in addition to Danny Farris was "And this guy named Pug; that's what Danny called him, Pug. I couldn't swear who it was; it might have been Gary. I couldn't swear who it was because I was drunk." He further testified that he and Danny and Pug rode around in a car for two or three hours when they decid-

ed they would go to the Dhyse house to get some "stuff" which they intended to sell. Upon being asked who went into the house with him he replied, "Me and this other guy named Pug." Danny Farris stayed in the car.

He acknowledged at the trial that the defendant who was in jail with him for the same offense was called Pug but persisted in his testimony that he did not know whether Gary Eugene Fischer was the one who participated in the entry of the Dhyse house with him. By reason of this witness' failure or refusal to identify the defendant, the prosecuting attorney declared to the court that he desired to treat him as a hostile witness. At this point the jury was returned to the jury room. Thereupon the prosecuting attorney produced before the court a written statement signed by witness Terry Stinebaugh. He read the following part of the statement to the court: "Sometime during August, 1972, myself along with Gary Eugene Fischer and Danny Lee Farris, we all three was riding around in Danny Farris car. We all decided to go get some stuff and sell it. Danny Farris was drinking some. We went to Frederick Dhyse house off Rt. 9, Long Hollow Road. Gary Fischer and I went into the house while Danny Farris waited in his car." The court stated that it would permit the state's attorney to ask the witness leading questions, but he would not permit him to impeach his witness with the statement signed by said witness.

Upon cross examination Terry Stinebaugh testified that he had known Gary Fischer, the defendant, for approximately four months and had seen him "About three or four times a week, five, something like that." Upon being asked if Gary Fischer was the person with him when he burglarized the Dhyse house he again stated he could not tell, that he was too drunk to notice and that he recalled Danny calling him Pug. Other witnesses were produced by the state who testified that Gary Eugene Fischer was known by the nickname Pug throughout the area.

No other witnesses for the state, except for the testimony in relation to the nickname Pug, in any way connected the defendant to this crime. Thereupon the state rested and the defendant's counsel moved the court to direct a verdict of not guilty on the ground that the state had failed to prove a prima facie case against the defendant which would support a verdict of guilty. Thereafter, but prior to the presentation of any evidence by the defense, the state moved to reopen its case for the purpose of introducing evidence of the written statement of Terry Stinebaugh to show a contradiction of his testimony on the stand. The motion was granted over the objection of the defendant's counsel. After considerable colloquy between the court and counsel, the prosecuting attorney read the above-quoted portion of the statement to witness Stinebaugh and asked him if he had made that statement. The witness said that it was his statement and that he had signed it. He denied, however, that he named Gary Eugene Fischer. His testimony in regard to this matter follows: "I told Clark and Batt [Deputy Sheriff] was there, too. I said, I don't know the guy's name but Pug—he said 'Gary Eugene Fischer?'—and I said, 'it might be'; I don't know." Over the objection of the defendant this portion of the statement was admitted into evidence. Both Sheriff Clark and Deputy Sheriff Batt were recalled to the stand and testified that Stinebaugh had, in fact, named defendant Gary Eugene Fischer when he made his statement. Again the state rested and once more the defendant moved for a directed verdict, which motion was denied.

Appearing as a witness for the defense, Danny Lee Farris testified that the defendant was not with him and Stinebaugh on the occasion of the burglary; that only those two were together; and that he remained in his car and was not aware of the breaking into the house by Stinebaugh. Upon cross-examination by the state's attorney, Farris said that he was too drunk to know who was in the group. The defendant took the stand and testified that he did not "think" he had been

with Terry Stinebaugh any time during the period of the 13th through the 20th of August. He admitted that he knew Danny Farris and Terry Stinebaugh and had seen the latter "maybe three or four times a week." He also noted that Stinebaugh knew him by name and acknowledged that he was known by the nickname of Pug. The defense rested and thereupon renewed its motion for a directed verdict of not guilty. The court denied the motion and after instructions were read to the jury and oral arguments made by counsel the jury retired to consider its verdict. It found the defendant guilty as charged in the indictment. Upon the refusal of the court to set aside the verdict and grant a new trial, the defendant prosecuted this appeal.

The appellant relies on the following assignments of error: (1) The court erred in refusing his motion to direct a verdict of not guilty at the conclusion of the state's evidence; (2) the court erred in "allowing the State to reopen the case and to examine the witness Stinebaugh as to a written statement which implicated the Defendant after the crime had been accomplished and after the witness had denied Petitioner's involvement when examined by the State."

In relation to the first assignment of error we are of the opinion that there was sufficient evidence to warrant submission of the case to the jury. In *State v. West,* 153 W. Va. 325, 168 S.E.2d 716 (1969) the Court cogently noted: "Upon motion to direct a verdict for the defendant, the evidence is to be viewed in light most favorable to prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt."

A review of the evidence in the instant case is pertinent to determine whether there is substantial evidence upon which the jury might justifiably find the defendant

guilty beyond a reasonable doubt. As a witness for the state, Terry Stinebaugh testified that he, along with Danny Farris and "this guy named Pug," drove out to the Dhyse house where he and Pug entered the house for the purpose of consummating their plan to burglarize it and get some "stuff" to sell. He acknowledged at the trial that the defendant who was in jail with him, charged with the same offense, was in fact Gary Eugene Fischer and was called Pug. Although during his testimony Stinebaugh indicated that he was too drunk on the occasion of the burglary to know who was with him he nonetheless was able to relate in detail the happenings of that evening. He acknowledged that he had known Gary Eugene Fischer for approximately four months and had seen him three or four times a week. Although, as aforesaid, he claimed to have been too drunk to know whether or not the defendant was with him during the burglary, he did not ever say that the defendant was not involved and acknowledged that he on that evening had heard Danny Farris call the defendant "Pug." Other witnesses were called on behalf of the state who testified that Gary Eugene Fischer was known by the nickname of Pug throughout the area.

After the state rested the defendant made a motion for a directed verdict of not guilty which motion was denied. Thereafter the motion of the state to reopen its case was granted and the state read a portion of Stinebaugh's signed statement which is quoted above and wherein Stinebaugh, in fact, named Gary Eugene Fischer as having participated in the burglary. Stinebaugh's testimony was indecisive as to whether the defendant was with him; he did say, however, that he had read the statement before he signed it.

In view of the evidence adduced during the presentation of the state's case, even prior to the so-called reopening on the motion of the state, substantial evidence existed which would allow a jury to determine the issue of guilt. If the jury believed Stinebaugh's testimony and the other witnesses, particularly with reference to the nickname "Pug" and the happenings of the evening in

question, its finding of guilt is consistent with a reasonable interpretation of the evidence and circumstances and such finding will not be disturbed. *State v. Bailey*, 151 W. Va. 796, 155 S.E.2d 850 (1967). Commenting on the function of the jury, the Court said, in Syllabus 2 of the *Bailey* case, "The jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses." *See also, State v. West, supra,* and *State v. Nuckols*, 152 W. Va. 736, 166 S.E.2d 3 (1968). Being of the firm opinion that the trial court did not err in overruling the defendant's motion for a directed verdict of not guilty, we find the appellant's first assignment of error to be without merit.

In its second assignment of error the defendant complains that the court erroneously permitted the State to reopen the case and examine witness Stinebaugh regarding his written statement. As to the propriety of permitting the case to be reopened, it is the general rule that it is within the sound discretion of the court in the furtherance of the interests of justice to permit a party, after it has rested, to reopen the case. 53 Am. Jur., *Trial*, § 123; 19 M.J., *Trial* § 9. We discern no abuse of that discretion in this case.

In *State v. Barker*, 128 W. Va. 744, 38 S.E.2d 346 (1946) the Court said: "The conduct of a trial is within the sound discretion of the trial court and to a large extent the trial court has full control of the order in which evidence is to be introduced." We believe that the tenor of the language in *Barker, supra,* permitted the trial court in the instant case to reopen the case in order to place before the jury the full meaning of Stinebaugh's testimony. This is particularly appropriate in this case for the reason that the defendant had not yet presented any of its evidence and there was no peril of surprise which the defendant would not have an opportunity to answer. In this sense this was not a true reopening and this action of the trial court, not being in abuse of its lawful authority, did not constitute error.

The defendant further contends that the trial court committed reversible error by permitting the State, on the reopening, to interrogate Stinebaugh regarding the statement alluded to above and which in some degree refuted his testimony on the stand. Upon the motion of the State to recall Stinebaugh, the defendant objected on the ground that under this Court's decision in *State v. Price and Bruce*, 114 W. Va. 736, 174 S.E. 518 (1934), a statement of a coconspirator made after the alleged conspiracy has terminated is inadmissible. Cited and relied upon also was *State v. Bennett*, ___ W. Va. ___, 203 S.E.2d 699 (1974).

In the *Price and Bruce* case and in the *Bennett* case the testimony which the Court held objectionable and to constitute reversible error was adduced from witnesses who were allegedly involved in the crimes with the defendants. In the former case the witness changed his plea from not guilty to guilty and had already been sentenced when he testified. In *Bennett*, when the witness testified, he had already been tried and convicted of a similar offense arising out of the same transaction which resulted in the defendant's trial.

Factually, this case is distinguishable from the cases relied upon by the defendant. Stinebaugh, so far as the record reveals, has not been convicted of the offense, either by a guilty plea or by trial. He is in the posture of a witness, even though he has admitted his participation in the subject crime. We perceive no reason for excluding Stinebaugh's testimony as to the events surrounding the burglary. Burglaries and such crimes do not ordinarily take place on the proverbial corner of Broad and Main Streets at high noon, but usually occur in the nighttime in a place secluded from view. If evidence such as this is excluded merely because one of the perpetrators of the crime admits that he was there and participated, much crime will unjustifiably go undetected. Fairness is the ultimate standard and while such testimony is unfavorable to the defendant, permitting its introduction is not unfair.

There being no reversible error in this case, the judgment of the Circuit Court of Morgan County is affirmed.

*Affirmed.*

NEELY, JUSTICE, *dissenting:*

I must respectfully dissent from the decision in this case. I do not cavil with the legal principles enunciated in the majority opinion but rather with the application of those principles to the evidence.

The holding in this case marks an alarming departure from the standard of proof beyond a reasonable doubt required for a criminal conviction. While the majority opinion expresses no other standard as applicable to the case, a review of the trial record reveals that the evidence presented by the State is at best scant, highly questionable, and certainly not sufficient to permit the case to be submitted to the jury. Therefore, I contend that the defendant's motion for a directed verdict at the close of the State's evidence should have been granted.

The only evidence presented by the State purportedly connecting the defendant with the crime was the testimony of Terry Steinbaugh. Steinbaugh testified that on the night in question, he found a pint bottle of whiskey along the road, took it to his home and drank it, and then later that evening met a friend, Danny Farris, "and this guy named Pug; that's what Danny called him, Pug. I couldn't swear who it was; it might have been Gary [the defendant]. I couldn't swear who it was because I was drunk."

Steinbaugh then stated that the three boys entered the Farris car and drove to the Dhyse cabin where "me and this guy named Pug," entered the cabin through an open window and committed the burglary. When asked additional questions by the prosecuting attorney concerning who participated in the alleged burglary, Steinbaugh repeatedly answered, "Me and this guy named Pug."

The State then asked permission from the court to treat Steinbaugh as a hostile witness, claiming surprise because of a prior inconsistent statement Steinbaugh had made to the police during the investigation of the robbery. After a lengthy discussion in chambers, the court refused the request. The defense counsel then asked the witness:

Q. ". . . was Gary Eugene Fischer, who's seated with me here now, the person who was with you and Danny on the evening that you burglarized the Dhyse house?"

A. "I couldn't tell you. I was too drunk to notice. The only thing that I heard was Danny calling him Pug. I couldn't hardly remember that."

The State then called two local residents who knew the defendant to testify that they had heard him referred to as Pug by his friends and associates. The State rested and the defense moved for a directed verdict which was refused by the court. The motion, however, should have been granted as the State had established only that a burglary had occurred; the evidence presented was devoid of any direct or positive evidence linking the defendant with the commission of the crime.

After the noon recess the court apparently conducted some quick research regarding treatment of hostile witnesses, and when the trial resumed the State was permitted to reopen its case in order to introduce into evidence a prior inconsistent written statement signed by the witness Steinbaugh. The State recalled Steinbaugh to the stand to confront him with this written statement over the objection of the defense counsel. The relevant portion of the statement which was read to the witness in the pressence of the jury, says:

"Sometime during August, 1972, myself along with Gary Eugene Fischer and Danny Lee Farris, we all three was riding around in Danny Farris' car. We all decided to go get some stuff and sell it. Danny Farris was drinking some. We went to Frederick Dhyse house off Rt. 9, Long

Hollow Road. Gary Fischer and I went into the house while Danny Farris waited in the car. The window was wide open. We went through it into the house. We looked in closets and upstairs then I stood outside and Gary Fischer handed the stuff out through the window."

The document, although signed at the end by Steinbaugh, was written in the handwriting of the deputy sheriff who transcribed the statement as it was given by Steinbaugh at a time just prior to his arrest. Steinbaugh, however, denied on the stand that he had mentioned the defendant's name in his statement. "I told [the story to] Clark, and Batt was there too [transcribing the statement]. I said, 'I don't know the guy's name but Pug'—he said, 'Gary Eugene Fischer?'—and I said, 'it might be; I don't know.'" Sheriff Clark and Deputy Batt both testified later that Steinbaugh had named the defendant in his statement. When the State rested once more, defendant again moved for a directed verdict, which the court again denied.

The defense then called Danny Farris to the stand. Farris testified that only he and Steinbaugh were involved in the burglary, and that there was no third party involved at all in the alleged crime. When the defense rested, defense counsel made a third motion for a directed verdict which the court refused a third time.

It is essential here to digress momentarily from the facts of this case in order to review some fundamental criminal law. It is well settled in this country that in a criminal trial the State has the burden of proof; that is, the burden to establish the guilt of the accused beyond a reasonable doubt. That burden continues throughout the trial. The burden, however, has two prongs: the burden of production and the burden of persuasion. The burden of production requires the State first to establish the *corpus delicti*; that is to say, the State must show beyond a reasonable doubt that a crime has been committed and must produce and present evidence with regard to each and every material element of the crime

charged in the indictment. The burden of persuasion, secondly, requires that the State prove the existence of facts which convince the trier of fact beyond a reasonable doubt that the defendant is the person guilty of the crime charged. *See generally*, LaFave and Scott, *Criminal Law*, Hornbook Series, Ch. 1, Sec. 8 (West Publishing Co. 1972). The result of the evidence must not only be consistent with the guilt of the accused, but must exclude every reasonable hypothesis of his innocence. *State v. Johnson*, 104 W. Va. 586, 140 S.E. 532 (1927). Furthermore, where circumstantial evidence is relied upon to convict, the accused is entitled to an acquittal unless the fact of guilt is proved to the actual exclusion of every reasonable hypothesis of innocence. *State v. Snider*, 106 W. Va. 309, 145 S.E. 607 (1928).

A mere cursory review of the record clearly shows that the State presented absolutely no specific evidence whatsoever which established that the defendant committed the crime. Therefore, for the reasons set forth below, I feel that the refusal of the trial court to direct a verdict for the defendant in this case was reversible error.

If at the close of the State's evidence or at the close of all the evidence the State has not met its burden of production and the evidence is insufficient, the court should direct a verdict for the defendant. *State v. McHenry*, 93 W. Va. 396, 117 S.E. 143 (1923); *State v. Shahan*, 104 W. Va. 578, 140 S.E. 533 (1927). The test in this State for passing on such a motion for a directed verdict is set forth in syllabus pt. 1 in *State v. West*, 153 W. Va. 325, 168 S.E.2d 716 (1969):

> "Upon motion to direct a verdict for the defendant, the evidence is to be viewed in light most favorable to prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is *substantial evidence* upon which a jury might justifiably find the de-

fendant guilty beyond a reasonable doubt." (Emphasis supplied.)

Stating that proposition in its converse makes the issue more readily understandable—that is, if substantial evidence is not presented so that reasonable men or a reasonable jury must *necessarily* have a reasonable doubt, then the court must pass favorably on the defendant's motion for a directed verdict. Applying either the proposition or its converse to the case at bar, a directed verdict should have been granted at each juncture when the defense so moved.

The only witness the State presented who could possibly connect the defendant with the commission of the crime could not and would not identify the defendant in court as the person whom he claimed aided him in the burglary of the Dhyse cabin. The State produced no other evidence linking the defendant to the burglary, and, therefore, I do not believe that the State sustained the burden of production. There were no fingerprints taken from the stolen articles when they were recovered by the police; the stolen articles were not found in the possession of the defendant nor even near him; and the testimony of the two eyewitnesses who admitted participation in the crime is conflicting and obscure—one witness stating that there was no third party at all with them on the night in question; the other witness unable positively to identify the defendant as the one whom he claimed aided in the burglary. Consequently, no reasonable interpretation can construe the State's evidence as "substantial evidence" required in *State v. West, supra,* to overcome a motion for a directed verdict for the defendant. The evidence certainly does not exclude every reasonable hypothesis of the defendant's innocence. *State v. Johnson, supra.*

The prior inconsistent written statement which the prosecution introduced to impeach the testimony of Steinbaugh after declaring him a hostile witness likewise did nothing to further the State's case against the defendant. The law of this State has long been that

contradictory statements by a witness regarding material facts are admissible for the purpose of weakening or destroying the value of his testimony but are not admissible as primary evidence of the controverted fact. *Jaggie v. Davis Colliery*, 75 W. Va. 370, 84 S.E. 941 (1915); *Wilson v. McCoy*, 86 W. Va. 103, 103 S.E. 42 (1920); *State v. Carduff*, 142 W. Va. 18, 93 S.E.2d 502 (1956). The rule is derived from the concept that a self-contradiction shows the witness as "capable of making errors" or demonstrates "some capacity to err." 3A Wigmore *Evidence* § 1017 (Chadbourn rev. 1970). The contradiction may be the result of a moral disposition to lie, partisan bias, faulty observation, defective recollection, or any other quality. *Ibid.* Professor Wigmore asserts that although the contradictory statement may not be offered as substantive evidence because extrajudicial statements of a witness are barred as hearsay, the contradictory statement may be offered for impeachment purposes.

> "We simply set the two [contradictory statements of the witness] against each other, perceive that both cannot be correct, and immediately conclude that he has erred in one or the other—but without determining which one. It is the repugnancy and inconsistency that demonstrates his error, and not the superior credibility of the prior statement. Thus, we do not necessarily accept his former statement as replacing his present one." 3A Wigmore *Evidence* § 1018 (Chadbourn rev. 1970).

This rule has received much criticism from many legal scholars, including Wigmore, because of the belief that a jury is incapable of the mental gymnastics required in hearing contradictory statements and then considering that evidence only for impeachment purposes and not as substantive evidence. Furthermore, the critics argue that the witness who made the prior out-of-court statement is now in court and subject to cross-examination with regard to both contradictory statements, and therefore, the introduction of the prior contradictory statement as substantive evidence should not be barred as inadmissible hearsay.

Despite all of the criticism, the rule in West Virginia is considered the orthodox rule and is followed in the vast majority of jurisdictions, the most notable exception being the Second Circuit as a result of a series of opinions written by Judge Friendly. *See, United States v. De Sisto*, 329 F.2d 929 (2nd Cir. 1964), *cert. denied*, 377 U. S. 979 (1964), and its progeny. The orthodox rule, nevertheless, provides that prior contradictory statements are not to be treated as having any substantive or independent testimonial value. *Bridges v. Wixon*, 326 U.S. 135 (1945); *United States v. Rainwater*, 283 F.2d 386 (8th Cir. 1960); *Brooks v. United States*, 309 F.2d 580 (10th Cir. 1962); *Byrd v. United States*, 342 F.2d 939 (D.C. Cir. 1965); *Goings v. United States*, 377 F.2d 753 (8th Cir. 1967); *United States v. Schwartz*, 390 F.2d 1 (3rd Cir. 1968); *Benson v. United States*, 402 F.2d 576 (9th Cir. 1968).

In the West Virginia cases of *Jaggie, Wilson,* and *Carduff* cited earlier for the orthodox rule, the prior inconsistent statements were introduced in rebuttal in order to discredit the testimony of witnesses called by the opposite party. In the case at bar, however, the court permitted the State to treat its own witness, Steinbaugh, as a hostile witness and allowed the State to mpeach him. The prior inconsistent statement could not oe used as primary evidence to prove whether the defendant actually participated in the burglary. It could be used only to impeach the credibility of Steinbaugh's testimony. What the State did, then, was to discredit the only witness who could connect the defendant with the burglary.

At the very foundation of our criminal justice system lies the oft-repeated principle that a man is presumed innocent until he is proved guilty—proved guilty beyond a reasonable doubt. The record clearly shows that the defendant in this case was not proved guilty beyond a reasonable doubt; not even proved guilty by clear and convincing evidence, nor even by a preponderance of the evidence. This case will serve as extraordinarily dangerous precedent. The majority contend that this defen-

dant's guilt has been proved beyond a reasonable doubt on the flimsy and highly questionable facts and evidence presented here. Unfortunately future cases will rely on this decision and other men will be convicted of criminal offenses on similarly scant evidence. Therefore, I fear that the majority opinion strikes a substantial blow at the fundamental presumption of innocence in our criminal justice system and at our system's time-honored standard in criminal trials of proof beyond a reasonable doubt.

For the foregoing reasons, I must respectfully dissent from the otherwise unanimous decision of this Court.