# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs)  No. 14-0797** (Cabell County 12-F-455)

**Michael Allen Fannin,**
**Defendant Below, Petitioner**

**FILED**

May 15, 2015

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Michael Allen Fannin, by counsel Jason Goad, appeals the Circuit Court of Cabell County's "Re-Sentencing Order," entered on April 22, 2014, sentencing petitioner to forty years in prison following his conviction of the offense of death of a child by a parent, guardian, custodian, or other person by child abuse. Respondent State of West Virginia, by counsel Laura Young, filed a response, to which petitioner filed a reply

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

### Facts

Following a jury trial in August of 2013, petitioner was convicted of the offense of death of a child by a parent, guardian, custodian, or other person by child abuse.[1] The victim, Emma, was the four-month-old infant daughter of Melissa Hershberger. The evidence at trial revealed that petitioner and Ms. Hershberger met online and developed a friendship. Petitioner provided child care for Emma for a few days prior to her death because she was wait-listed for daycare.

On April 29, 2011, Emma was dropped off at petitioner's apartment around 7:00 a.m., and Ms. Hershberger went to her job at St. Mary's Hospital in Huntington. Around 8:30 a.m., petitioner contacted Ms. Hershberger to report that Emma was not acting normally; he advised that she was acting like she had a cold or was congested. At Ms. Hershberger's request, petitioner brought Emma to her at St. Mary's Hospital around 9:00 a.m. Emma was not

---

[1] West Virginia Code § 61-8D-2(a) states that "[i]f any parent, guardian or custodian shall maliciously and intentionally cause the death of a child under his or her care, custody or control by his or her failure or refusal to supply such child with necessary food, clothing, shelter or medical care, then such parent, guardian or custodian shall be guilty of murder in the first degree."

responding to stimuli. After being further questioned by Ms. Hershberger, petitioner stated that Emma had fallen from his arms onto the sofa, but did not hit anything hard where she landed.

Emma died after spending four days in the hospital. Because Emma's injuries did not match petitioner's explanation for them, the police were notified and began an investigation. The lead investigating officer took photographs of petitioner's apartment that did not reveal any hard surfaces on the sofas that could have caused Emma's injuries. Petitioner ultimately gave a statement to the police in which he changed his explanation that Emma fell onto the sofa to state that he had dropped Emma onto the apartment's concrete floor, head first.

The trial testimony revealed that Ms. Hershberger took Emma to the emergency room, where she presented almost unresponsive, with a bruise on her head. Emma's bruise had swelling under it, which increased while she was in the emergency room. She did not respond to the pain from the insertion of an IV and did not resist any of the treatments. Emma was transferred to the pediatric intensive care unit. Despite Ms. Hershberger's continued attempts to obtain additional information from petitioner, petitioner never reported any other cause for Emma's condition other than falling onto the sofa. Emma was examined by a pediatric ophthalmologist who noted that her head was swollen; that her pupils were enlarged; that her retina was covered in blood; and that blood had covered the eye from front to back. The ophthalmologist testified that there was no other explanation for the severity of Emma's retinal hemorrhages other than shaken baby syndrome. Emma's CT scan revealed a skull fracture as well. The medical testimony from the several physicians who treated Emma was that her injuries could not have resulted from a single impact, but were likely caused by being shaken and then slammed against something.[2] The fracture was determined to have occurred after the shaking, as opposed to being a trigger for the other injuries.

The chief medical examiner who performed Emma's autopsy testified that her injuries were inflicted, not accidental, and when coupled with the infant' death, were not consistent with a short fall. She testified that the nature of Emma's retinal hemorrhages and detachment would not arise from a simple fall, but were consistent with abusive head trauma. She ruled Emma's death a homicide.

Testimony was also presented from petitioner's next door neighbor. He testified that despite the building's concrete construction, it was possible to hear through the walls. The neighbor testified that on the morning in question, he heard a baby crying and heard petitioner screaming for her to shut up. He also heard a clapping type noise. The neighbor further testified that the baby kept crying and petitioner said "foul" things to her, and that the baby was "getting on his nerves." According to the neighbor, as the baby got louder, he could hear petitioner yelling at her to shut up.

At the end of the State's evidence, petitioner moved for judgment of acquittal, which the circuit court denied. The court found that the State presented enough evidence to show that

---

[2] At trial, petitioner called his own physician expert witness who, based on his review of Emma's medical records, disagreed with the diagnosis of shaken baby syndrome, but could not describe the exact mechanism for her injuries. He ultimately acknowledged that Emma could have been shaken.

petitioner misled Emma's medical providers with multiple explanations for her injuries; that Emma suffered an injury resulting in her death; that her death took significant force; and that the jury could infer petitioner's intent from his actions. Petitioner presented no additional evidence. The jury deliberated for approximately two hours before finding petitioner guilty. The circuit court sentenced petitioner to forty years in prison. Petitioner now appeals to this Court.

**Discussion**

Petitioner raises three assignments of error on appeal. First, he contends that the circuit court erred by failing to strike one of the jurors for cause because the juror's wife was an employee of the Cabell County Prosecuting Attorney's Office. During voir dire, Juror No. 6 revealed that his wife was employed in the Cabell County Prosecuting Attorney's Office as a secretary. Juror No. 6's answers or lack of affirmative responses to other general voir dire questions from the court indicated that he knew nothing about the case and did not know the attorneys involved. After his wife's employment was revealed, Juror No. 6 was asked additional questions out of the presence of the rest of the panel. He indicated that his wife's employment would not cause him any bias and that he could be fair and objective in assessing the evidence.

Petitioner moved to strike Juror No. 6 for cause, which the circuit court denied based on the juror's indicated lack of bias. The assistant prosecutors corroborated the juror's assertion that they did not work with the juror's wife. Ultimately, petitioner used a peremptory challenge to strike Juror No. 6 from the jury.

Petitioner concedes that our current law does not support his argument that the failure to strike Juror No. 6 for cause is reversible error. In *State v. Phillips,* 194 W.Va. 569, 461 S.E.2d 75 (1995), this Court rejected a defendant's argument that the necessity to use a peremptory challenge to strike a biased juror was unconstitutional; but, the Court agreed that West Virginia Code § 62-3-3 grants a defendant the right to reserve his peremptory challenges until an unbiased jury panel is assembled, the infringement of which is reversible error. However, this holding was overruled by *State v. Sutherland,* 231 W.Va. 410, 745 S.E.2d 448 (2013), in which we followed the ruling of the U.S. Supreme Court in *U.S. v. Martinez-Salazar,* 528 U.S. 304 (2000). Syllabus Point 3 of *Sutherland* states as follows:

> A trial court's failure to remove a biased juror from a jury panel, as required by W.Va. Code § 62–3–3 (1949) (Repl.Vol.2010), does not violate a criminal defendant's right to a trial by an impartial jury if the defendant removes the juror with a peremptory strike. In order to obtain a new trial for having used a peremptory strike to remove a biased juror from a jury panel, a criminal defendant must show prejudice. The holding in Syllabus point 8 of *State v. Phillips,* 194 W.Va. 569, 461 S.E.2d 75 (1995), is expressly overruled.

Petitioner admits there is no prejudice. However, he seeks to overrule *Sutherland* and to return to the reasoning in *Phillips* on the basis that it is contrary to the statutory intent of providing the defendant with a certain number of peremptory strikes. As we stated in *Sutherland,* the overwhelming majority of states require a showing of prejudice because

3

it recognizes that when a defendant has been tried before an unbiased jury, he or she has received exactly what the constitution guarantees. Consequently, a defendant should be required to show prejudice resulting from the selection of an unbiased juror. To hold otherwise results in an unjustifiable waste of judicial time and resources.

231 W.Va. at 420, 745 S.E.2d at 458. Under the facts and circumstances presented in this case, we decline to deviate from our reasoning in *Sutherland*.[3] Accordingly, we reject petitioner's request to reverse his conviction due to the court's failure to strike Juror No. 6 for cause.

In his second assignment of error petitioner argues that the circuit court erred by admitting expert testimony in the form of a study by a pediatric intensive care physician without conducting a proper inquiry into the reliability of the study. One of the State's witnesses was Dr. Eduardo Pino, a pediatric intensive care physician who treated Emma. He was participating in a statewide study involving multiple hospitals to establish a database or registry regarding shaken baby syndrome. The study consisted of a chart review of babies who presented in West Virginia with what were believed to be abusive injuries. The chart review was initially for babies diagnosed with shaken baby syndrome and later expanded to include fractures. The most common reported history was that the baby had fallen, and in ninety-eight percent of the cases, the history did not explain the extent of the injuries, and the majority of reports involved a male perpetrator. The goal of the study was to develop trends and risk factors regarding shaken baby syndrome.

The results of the study were presented to the jury over the objection of petitioner. Petitioner's objection was based on his assertion that the State had not laid a foundation that the study had been peer-reviewed. Because Dr. Pino was a part of the study and gathered the data, the court overruled the objection.

Petitioner argues that Dr. Pino's study directly contradicted petitioner's theory that Emma suffered an accidental fall. He contends that the circuit court's basis for overruling his objection to the study was incorrect; to petitioner, it matters not whether Dr. Pino gathered data himself. Petitioner asserts that the circuit court failed to consider following the factors before allowing the jury to hear about the study: "(a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community." *Wilt v. Buraker,* 191 W.Va. 39, 46, 443 S.E.2d 196, 203 (1994).

---

[3] In any event, the reasoning behind both *Phillip* and *Sutherland* is premised upon a finding that the juror in question was actually biased. Based on our review of the record below, we do not find that the court erred by failing to strike Juror No. 6 for cause because his answers in voir dire demonstrated that, despite his wife's employment, he would give no more credence to the State's position than that of petitioner; that her employment would not affect his decision; and that his decision in the case would be based solely on the evidence.

4

"The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. Pt. 4, in part, *State v. Bowling,* 232 W.Va. 529, 753 S.E.2d 27 (2013) (citations omitted). Upon our review, we find no abuse of discretion by the circuit court in admitting Dr. Pino's study. We disagree with petitioner that the circuit court was required to engage in the analysis petitioner advocates. As the State points out, the study was not described as involving experimentation, hypotheses, or scientific deduction or conclusion. It was an informational study only. No gatekeeping analysis was required because the testimony was neither novel nor scientific. *See* Syl. Pt. 3, *Watson v. Inco Alloys Int'l, Inc.,* 209 W.Va. 234, 545 S.E.2d 294 (2001) (holding that the gatekeeping analysis set forth in *Wilt* need not be applied where the testimony is not "scientific."). The testimony at issue in the present case was an historical reporting of injuries that were diagnosed as shaken baby syndrome, the age of the baby, the inconsistency in the reported cause with physical findings, and a high proportion of male perpetrators. Dr. Pino offered no opinion derived from the study and petitioner did not object to its relevance.

In any event, we believe any error in the admission of the study is harmless. *See Bowling,* 232 W.Va. at 542, 753 S.E.2d at 40 (holding that an abuse of discretion is not reversible if the error is harmless.) Petitioner cannot demonstrate that he was prejudiced by the admission of the study. Even without the testimony about the study, there was ample evidence that Emma died from being shaken and slammed and that petitioner was the only person who could have inflicted the trauma that killed her.

Petitioner's final assignment of error is that the circuit court applied the wrong standard to his motion for judgment of acquittal. At the close of the State's evidence, petitioner moved for judgment of acquittal, arguing that the State failed to prove malice. The circuit court denied the motion, stating, "I'm going to deny your motion. The State has met its burden, which is obviously not beyond a reasonable doubt, it's simply a preponderance of the evidence." Petitioner states that the proper standard, as set forth in Syllabus Point 8, in part, of *State v. Myers,* "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." 229 W.Va. 238, 728 S.E.2d 122 (2012) (quoting Syllabus Point 1, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). Petitioner further argues that there was insufficient evidence for the jury to find malice. He contends that because no weapon was used, malice cannot be inferred, and that the only evidence remotely related to malice was from the neighbor who testified that petitioner yelled at Emma to shut up. Petitioner contends that this testimony does not suffice to show malice and his conviction should be overturned.

Upon our review, we do not believe that the circuit court's comment in denying petitioner's motion for judgment of acquittal warrants reversal of his conviction. We have held as follows:

> """Upon motion to direct a verdict for the defendant, the evidence is to be viewed in light most favorable to prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is

substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." *State v. West*, 153 W.Va. 325, 168 S.E.2d 716 (1969).' Syl. pt. 1, *State v. Fischer*, 158 W.Va. 72, 211 S.E.2d 666 (1974)." Syl. Pt. 10, *State v. Davis*, 176 W.Va. 454, 345 S.E.2d 549 (1986).

Syl. Pt. 1, *State v. Rogers,* 209 W.Va. 348, 547 S.E.2d 910 (2001) (overruled on other grounds by *State v. Coles*, 234 W.Va. 132, 763 S.E.2d 843 (2014)). Even if the circuit court inartfully phrased the precise standard for viewing petitioner's motion for judgment of acquittal, it is clear from our review of the record that the State presented substantial evidence that a jury might find petitioner guilty beyond a reasonable doubt.

As for petitioner's claim that there was insufficient evidence to sustain the jury's verdict, we disagree. With respect to a claim of insufficiency of the evidence, we have held that

> [a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. Pt. 3, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). As the State correctly argues, the jury heard testimony that petitioner initially lied about Emma's condition. Then, he lied about what happened to Emma, stating the he dropped her onto the sofa. His eventual story that he dropped Emma onto the floor was not consistent with the overwhelming medical testimony. The jury could infer from the neighbor's testimony that petitioner acted with malice and intent, as well as from the testimony of multiple physicians who testified that Emma's injuries were not the result of being accidentally dropped.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** May 15, 2015

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Menis E. Ketchum
Justice Allen H. Loughry II