IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

FILED

**April 7, 2026**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**CHRISTY K.,**
**Respondent Below, Petitioner**

**v.) No. 25-ICA-253**  (Fam. Ct. Putnam Cnty. Case No. FC-40-2017-D-356)

**JIMMY K.,**
**Petitioner Below, Respondent**

## MEMORANDUM DECISION

Petitioner Christy K.[1] ("Mother") appeals the Family Court of Putnam County's May 21, 2025, order modifying custody and awarding Respondent Jimmy K. ("Father") sole primary custodial allocation of the parties' children. Father and the guardian ad litem ("GAL") for the children filed responses in support of the family court's order.[2] Mother filed a reply.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the family court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

The parties were divorced in 2018 and share four minor children who are eleven, thirteen, fifteen, and seventeen years old. The 2018 final divorce order allocated primary custody of the children to Mother and Father received ten nights per month of parenting time. On March 29, 2023, Mother filed a pro se petition for ex parte relief for emergency custody after Father drank excessively and drove while the children were passengers in his vehicle.[3] The family court suspended Father's parenting time and required him to submit to alcohol testing.

---

[1] To protect the confidentiality of the juveniles involved in this case, we refer to the parties' last name by the first initial. *See, e.g.*, W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] Mother is represented by Joseph W. Hunter, Esq. Father is represented by G. Wayne Van Bibber, Esq. The GAL for the children is Maggie J. Kuhl, Esq.

[3] The record indicates that Father drove with the children while he was intoxicated. The children, who were distraught, texted and called Mother during the drive. Mother

On April 25, 2023, Mother, self-represented, filed a petition to modify custody alleging that Father had tested positive for alcohol, in violation of the court's order. Mother asked the family court to require Father to undergo a substance abuse evaluation and supervise his parenting time until his status improved. Mother alleged that Father's regular drinking habits made the children nervous.

The family court held a temporary hearing on Mother's petition to modify on May 10, 2023, at which time the court reinstated Father's parenting time, but restricted him from consuming alcohol, required him to submit to alcohol monitoring, and prohibited him from driving with the children. The family court also appointed a GAL for the children.

On October 30, 2023, the family court held a second temporary hearing at which time the court heard testimony from a Child Protective Service ("CPS") worker and the GAL. The CPS worker testified that Father completed an in-home safety plan and the GAL testified that Father had actively sought and complied with treatment. The GAL further expressed concerns that Mother was on a course of conduct designed to alienate the children from Father. By order entered December 6, 2023, the family court ordered that Father and the two oldest children attend counseling and that Father continue alcohol monitoring.

The court held a third temporary hearing on Mother's petition on August 26, 2024, and entered an order from that hearing on December 18, 2024. In that order, the court found that the GAL opined that Father has an alcohol problem, recommended that the court keep the restriction on Father's alcohol consumption in place, and was not opposed to the court's continued monitoring of Father's alcohol consumption. The court found that the GAL opined that Father had taken responsibility for his actions and complied with all the requirements of CPS, the court, and the GAL. The court expressed that the GAL had concerns regarding Mother's resistance to restoring Father's original parenting time and Mother's contributions toward the children's strained relationship with Father since the seventeen-year-old refused to participate in Father's parenting time. The family court also heard from the two older children's therapist, Brittany Franklin. Ms. Franklin testified that while the children refused to participate in Father's parenting time, Mother needed to be more authoritative and opined that Mother needed to punish the children if they refused to participate in Father's parenting time. The GAL testified to having conversations with Mother to encourage Mother's promotion of a positive relationship between the children and Father. The GAL recommended that Father receive a minimum of 50-50 parenting time to "balance out the conduct of Mother." The court found that it was in the children's

---

called 911 and upon law enforcement's arrival, Father was found asleep in the driver's seat of his vehicle, the children were extremely upset and afraid, and Father's BAC was .18. However, Father was not arrested or criminally charged, and the responding officer released the children to Mother at the scene.

best interest to have a relationship with both parents and noted that "[n]o one is saying [Father] is not at fault for what started [the modification proceedings] but what the GAL is saying is that [Mother] is not helping to fix it." The court recognized that it may be Father's fault for not having a good relationship with the seventeen-year-old but specifically found that if Mother "cannot control her daughter, then we have a problem."

In this December 18, 2024, order the court ordered Father to attend the seventeen-year-old's therapy sessions with Ms. Franklin, awarded Father three hours of weekly parenting time with the seventeen-year-old, ordered Ms. Franklin to address issues between the fifteen-year-old and Father, ordered Ms. Franklin to instruct the parties as to when Father's parenting time would begin regarding that child, ordered Ms. Franklin to start seeing the two younger children to assess their relationship with Father, and ordered Ms. Franklin to establish Father's parenting time. The court further ordered Ms. Franklin to work towards the children's reconciliation with their Father and a 50-50 parenting plan. The court ordered Father to continue the alcohol monitoring device and reminded Mother that she must deny the children any discretion in participating in Father's parenting time. This December 18, 2024, order scheduled a final hearing on Mother's petition to modify for January 13, 2025.

On January 13, 2025, the family court held a final hearing on Mother's petition. During this hearing, the court heard testimony from Dr. Megan Green, who had met with Mother and performed a psychological evaluation. Dr. Green testified that Mother's behavior served no constructive end and was not in the best interest of the children. Dr. Green opined that Mother had engaged in parental alienation against Father and did not have the necessary self-reflection to modify her behavior. Dr. Green testified that the children have been primed to overestimate the risks posed by Father, must be desensitized to those risks to repair the relationship, and recommended that custody be transferred to Father with Mother receiving limited supervised parenting time.

During the final hearing, the court also heard testimony from the children's therapist, Ms. Franklin, regarding updates since the last hearing. Ms. Franklin testified that Father's parenting time had expanded to one overnight per week and that she was met with resistance by Mother when attempting to further expand Father's parenting time. Ms. Franklin opined that Mother believed she was doing what was best to protect the children and that Mother also believed that everyone failed to see or minimized Father's issues, thereby jeopardizing the children's safety. Ms. Franklin opined that Mother had engaged in parental alienation and made no effort to resolve her behaviors, despite warnings from herself and the GAL. Ms. Franklin opined that the only recourse was to reverse custody and supervise Mother's parenting time. The GAL testified and deferred to the recommendations of Dr. Green and Ms. Franklin.

Based on the evidence presented, the court orally found that the parties were "equally guilty" but that the difference was Father was complying with fixing his issues

and Mother was not. The court orally found that Mother was controlling the children by alienating them from Father. The court ordered custody of all four children to immediately transfer from Mother to Father at 7:00 p.m. that same evening until the next hearing on January 23, 2025. The court stated that "it will be an issue if Mother cannot get the children out of the car at dad's house and will be evidence that Mother cannot control the kids." The court informed Mother that if the children did not get out of the car at 7:00 p.m. then she was to immediately report to Western Regional Jail. Mother inquired about the stability of the children being in their best interest and how it would affect them by drastically switching custody so abruptly. The court responded, "yes, so why didn't you say that?" Mother then asked if she could move to withdraw her petition to modify so that the prior 2018 custody order with Father receiving ten days per month could remain in effect. The court informed Mother that she was not permitted to withdraw her petition since it had already made its ruling.

On the following day, January 14, 2025, Father, by counsel, filed a petition to modify custody alleging that there had been a substantial change in circumstances since the December 18, 2018, order because Mother was engaging in parental alienation. Father sought to have primary custody of the children with Mother receiving limited professionally supervised visitation. Father asserted that after his drinking and driving incident with the children, he voluntarily signed a safety plan with CPS, agreed to breath testing, and voluntarily completed the Army Substance Abuse Program through the West Virginia Army National Guard. Father argued that as the case progressed with Mother's petition to modify, she became obsessed with depriving Father of any meaningful parenting time and routinely deprived him of his court ordered parenting time despite the safety protocols in the court's orders. Father contended that as a result of her behavior, he sought a psychological fitness evaluation of Mother, which resulted in Dr. Green's opinion. Father maintained that Mother threatened to file criminal charges against Father if she did not get her way. Father contended that modifying the December 18, 2018, order would be the children's last chance to have a meaningful relationship with Father before it was destroyed by Mother.

On January 24, 2025, Mother filed a response to Father's petition for modification arguing that the January 23, 2025, hearing on her petition to modify had already been scheduled before Father filed his petition for modification on January 14, 2025, and that "no notice was given to join this Petition with the agenda of the hearing on the 23rd." Mother further alleged that six hours before Father filed his petition, she received a settlement offer via email from Father's attorney offering 50-50 custody with a contingency that Mother request a letter from the prosecutor indicating that they would not pursue charges in regard to the drinking and driving allegations against Father. Mother asserted that as evidenced by counsel's email, Father did not believe her to be undeserving of parenting time and that the modification would cause severe destabilization for the children.

On January 23, 2025, the family court held a fifth hearing on Mother's petition. The court heard testimony, argument, and both parties rested their respective cases. On February 14, 2025, the court entered a Temporary Order on Mother's petition which memorialized the January 13, 2025, and January 23, 2025, hearings. First, the court found that on January 13, 2025, based on the recommendations of Ms. Franklin, Dr. Green, and the GAL, and on its finding that it was the only resolution to salvage Father's relationship with the children, it ordered that physical custody of the children was to immediately transfer from Mother to Father. Regarding the January 23, 2025, hearing, the court found that the GAL testified regarding her continued concern about Mother's controlling and alienating behavior since the January 13, 2025, hearing. The GAL recounted that Father texted the GAL during the evening of January 13, 2025, after the custody exchange, and reported that the seventeen-year-old was cussing Father, slamming doors, threatening to run away, and that three of the four children told him that they hated him. The GAL called Mother while at Father's home in hopes that Mother would calm the children down from the GAL's phone. Mother told the GAL that the children's reactions should not be a surprise and the GAL opined that Mother was not interested in helping to calm the children, but Mother did indicate that the GAL could reach out to her if they would not calm down. The children were calm when the GAL left Father's home. The GAL also testified that a day or two after that incident, Father contacted Mother for the children's birth certificates and social security cards for enrollment in school. Rather than provide the documents to Father, Mother took them directly to the schools. The GAL opined that Mother's behavior was indicative of her control issues and expressed concerns with Mother meeting the children's school counselors given her history of disparaging Father.

The family court's February 14, 2025, temporary order went on to explain that the GAL visited the children again on January 17, 2025, at Father's home where the seventeen-year-old made a series of complaints against Father, such as how he has not done much with them, and that she will not visit him once she turns eighteen. The GAL reported that the seventeen-year-old was conditioned to turn everything about Father into something negative. The fifteen-year-old expressed that he wanted to live with Mother and have a more stable life, which the GAL noted was consistent with the language Mother used. The children asked the GAL questions about court proceedings, counseling with Ms. Franklin, and why their Father was not arrested for DUI. The GAL reported that the children believed Father was to blame for the reversal of custody and that Mother bore no responsibility. The GAL stated that she was not downplaying Father's actions from nearly two years ago that led to Mother's petition but opined that the children's continued reactions regarding Father's drinking and driving incident were out of proportion. The GAL opined that the children were likely modeling Mother's behavior, as she believed they were conditioned to adopt Mother's thoughts and feelings. The court further found that Mother continued to deny engaging in any alienating behaviors and argued that she had done everything asked of her to further the children's relationship with Father. The court also found that the parties could not work collaboratively and in cooperation with each other in the children's best interest pursuant to West Virginia Code § 48-9-207(a) and that Dr. Green's

recommendation for Father to have sole physical custody of the children remained unchanged.

Regarding Mother's April 25, 2023, petition for modification, the court found that Father's alcohol abuse that prompted the filing of Mother's petition in 2023 was no longer an issue, identifying the steps Father had taken to remedy his alcohol abuse; therefore, the court denied Mother's 2023 petition for modification. As to Father's January 14, 2025, petition to modify custody, the court found that Mother engaged in alienating behaviors and awarded Father sole legal and physical custody of the four children and awarded Father sole decision-making authority. The court awarded Mother supervised parenting time through a visitation facility up to two times per week based on the provider's ability and monitored telephone calls with the children up to three times per week, not to exceed one hour for each time, based on the provider's ability. The court further ordered Mother to "participate in intense individual therapy focused on recognizing her alienating behaviors with the goal of modifying her behaviors and fostering appropriate interactions with the children and Father and further, fostering a positive co-parenting relationship with Father." The court also prohibited Mother from communicating with the children through any other platform and scheduled a final hearing for April 29, 2025.

On April 29, 2025, the family court held a hearing pursuant to its February 14, 2025, Temporary Order. For the first time, Mother appeared by counsel, whom she retained after the January 23, 2025, hearing. Mother's counsel sought to present evidence and call witnesses, but the court denied counsel that opportunity because the hearing was a "compliance hearing," rather than a final hearing, both parties had rested their cases at the January 23, 2025, hearing, and the court had already found that Mother engaged in parental alienation. Mother's attorney argued that the court's February 14, 2025, Temporary Order set the hearing as a final hearing and not a compliance hearing. The court acknowledged that the temporary order stated that the April 29, 2025, hearing was to be a final hearing, but the court remained steadfast in its decision. However, the court permitted Mother, by counsel, to call her therapist as a witness for the court to determine whether Mother's therapy was in compliance with the temporary order.

On May 21, 2025, the family court entered a Final Order stating that it conducted final hearings on Mother's petition to modify and Father's petition to modify on January 13, 2025,[4] January 23, 2025, and April 29, 2025. Regarding Mother's April 25, 2023, petition to modify based on Father's alcohol abuse, the court reiterated its decision to deny the same as reflected in its February 14, 2025, temporary order and its prior findings that Father's previous alcohol abuse was not a current problem and as such, it was not a basis to warrant a modification. As to Father's January 14, 2025, petition to modify, the court reiterated its decision to grant the same as reflected in the February 14, 2025, temporary

_____

[4] As stated previously, Father filed his petition to modify on January 14, 2025.

order, and awarded him sole legal and physical custody of the children with sole decision-making authority pursuant to its previous findings based upon the evidence presented at the January 13, 2025, and January 23, 2025, hearings, and the recommendations of both Ms. Franklin and Dr. Megan Green at the January 23, 2025, hearing.

Regarding the April 29, 2025, hearing, the court found that while Mother had participated in thirteen sessions of therapy with her therapist for a three-week workshop after the January 13, 2025, hearing, Mother had not complied with the February 14, 2025, Temporary Order's therapy treatment plan. The court ordered Dr. Green to recommend a therapist to work with Mother within the parameters of the court's order. It is from this May 21, 2025, final order that Mother now appeals.

When reviewing the order of a family court, we apply the following standard of review:

> When a final order of a family court is appealed to the Intermediate Court of Appeals of West Virginia, the Intermediate Court of Appeals shall review the findings of fact made by the family court for clear error, and the family court's application of law to the facts for an abuse of discretion. The Intermediate Court of Appeals shall review questions of law de novo.

Syl. Pt. 2, *Christopher P. v. Amanda C.*, 250 W. Va. 53, 902 S.E.2d 185 (2024); *accord* W. Va. Code § 51-2A-14(c) (2005) (specifying standards for appellate court review of family court orders).

Mother argues three assignments of error on appeal. First, Mother contends that the family court erred by "recharacterizing" the April 29, 2025, final hearing as a "compliance hearing" even though it had been set as a final hearing as stated in the February 14, 2025, Temporary Order. We disagree.

The Supreme Court of Appeals of West Virginia ("SCAWV") has held that

> [i]t is within the sound discretion of the court in the furtherance of the interests of justice to permit either party, after it has rested, to reopen the case for the purpose of offering further evidence and unless that discretion is abused the action of the court will not be disturbed.

*Contemp. Galleries of W. Virginia, Inc. v. Riggs Com. Realty, LLC*, 246 W. Va. 431, 436, 874 S.E.2d 34, 39 (2022) (citing Syl. pt. 4, *State v. Fischer*, 158 W. Va. 72, 211 S.E.2d 666 (1974)); *see* Syl. Pt. 4, *Adams v. Sparacio,* 156 W. Va. 678, 196 S.E.2d 647 (1973) (motions to reopen are in the sound discretion of the trial court); *see Graham v. Wallace*, 208 W. Va. 139, 143, 538 S.E.2d 730, 734 (2000) (confirming that absent abuse of

7

discretion, it is in the sound discretion of the trial court to reopen a matter after the parties have rested).

Here, the family court conducted final hearings on January 13, 2025, and January 23, 2025. The family court heard testimony from multiple witnesses, including the GAL and two expert witnesses, and considered the parties' evidence and arguments. Notably, each hearing lasted approximately four to five hours. The recording of the January 23, 2025, hearing, reveals that Father rested his case and Mother informed the court that she had no further witnesses or evidence to present. While the temporary order from the January hearings scheduled a "final hearing" for April 29, 2025, the record clearly demonstrates that the April 29, 2025, hearing was set to allow the court to consider whether Mother was complying with its temporary order. As it is in the family court's discretion to allow either party to offer further evidence after resting, we find no error in the family court's decision to preclude Mother from reopening her case to offer further evidence.

For her second assignment of error, Mother argues that the family court erred by finding that she engaged in parental alienation because the court based that finding solely on the "observations and the testimony" of the GAL, Dr. Green, and Ms. Franklin, calling the same "circumstantial claims." In support of this argument, Mother relies on this Court's decision in *Jonpaul C. v. Heather C.,* 248 W. Va. 687, 889 S.E.2d 769 (Ct. App. 2023), specifically, the following quotation:

> A finding of parental alienation is very significant. Parental alienation has an everlasting effect on both the child and the parents involved, and courts should not make such a finding without very clear evidence to support that finding. To date, neither the Legislature nor the Supreme Court of Appeals of West Virginia has set forth specific factors for courts to use in determining parental alienation. Nonetheless, making such a finding is so significant that it is incumbent on the lower courts to conduct a detailed, logical, common-sense analysis based on the evidence adduced, and make such findings which either support or do not support a finding of parental alienation.

*Id.* at 696, 889 S.E.2d at 778 (2023).

As reflected in the final order on appeal, the family court analyzed the evidence presented at the January 13, 2025, and January 23, 2025, hearings, including the testimony of the two expert witnesses and the GAL, based upon the five factors identified in *The Five-Factor Model for the Diagnosis of Parental Alienation*, J. Am. Academy of Child & Adolescent Psychiatry, Vol. 61 (May 2022) and the eight factors identified in *The Parental Alienation Syndrome*: *A Guide for Mental Health and Legal Professional. See Jonpaul C.* at n. 13. The family court made specific findings of fact corresponding to these factors in its order. Additionally, the family court specifically relied on the SCAWV's decision in *Nathan H. v. Ashlee R.,* No. 21-1019, 2023 WL 245344 (W. Va. Jan. 18, 2023)

8

(memorandum decision) in considering the uncontroverted testimony of expert witnesses largely supported by information provided by children.

This Court has explained that:

> [We] cannot set aside a family court's factual findings "unless they are clearly erroneous." A finding is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Syl. Pt. 1, *In re Tiffany Marie S*., 196 W. Va. 223, 470 S.E.2d 177 (1996). Under the clearly erroneous standard, an appellate court does not reweigh the evidence and cannot reverse a family court's findings simply because it may have viewed the evidence differently. *See Mulugeta v. Misailidis*, 239 W. Va. 404, 408, 801 S.E.2d 282, 286 (2017).

*James W. v. Ciara R*., No. 23-ICA-237, -238, -239, 2024 WL 1740353, at *6 (W. Va. Ct. App. Apr. 22, 2024) (memorandum decision). A reviewing court must affirm a finding if the family court's account of the evidence is plausible in light of the record viewed in its entirety. *See In the Interest of: Tiffany Marie S*., 196 W.Va. at 225, 470 S.E.2d at 179, Syl. Pt. 1.

Here, the family court considered the evidence presented, including the testimony of the GAL, Dr. Green, and Ms. Franklin, and gave substantial weight to their opinions that Mother had been engaging in ongoing parental alienation.[5] Based on the experts' opinions

---

[5] We note that the family court does not identify a limiting factor found in West Virginia Code § 48-9-209 in its analysis and instead relies on parental alienation as its basis for modifying the parenting plan. *See* W. Va. Code § 48-9-401(d). Although parental alienation is not identified as a limiting factor set forth in the Code, there are two limiting factors that closely mirror the principles of parental alienation. West Virginia Code § 48-9-209(f)(6)-(7) state:

> In determining whether the presumption for an equal (50-50) allocation of physical custody has been rebutted, a court shall consider all relevant factors including any of the following:
>
> (6) Whether the parents cannot work cooperatively and collaboratively in the best interest of the child; or
>
> (7) Whether a parent will encourage and accept a positive relationship between the child and the other parent, including which parent is more likely to keep the other parent involved in the child's life and activities.

and recommendations, the court specifically found that "the only resolution to salvage Father's relationship with the children was to transfer custody to Father" in hopes that the transfer would "stop the alienating behavior and spare Father's relationship with the children." The court explained that prior to Father's drinking and driving incident that led to the filing of Mother's petition, "the children enjoyed a positive relationship with Father[.]" Based on the record before us, we are unable to conclude that the family court's findings regarding parental alienation were clearly erroneous. *See State v. Guthrie*, 194 W. Va. 657, 669 n.9, 461 S.E.2d 163, 175 n.9 (1995) ("An appellate court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact.").

Lastly, Mother argues that the family court abused its discretion by taking the "drastic remedy" of modifying the custodial allocation in a manner contrary to the children's expressed preferences and their best interests. In support of her argument, Mother asserts that Ms. Franklin, Dr. Green, and the GAL all acknowledged that a complete reversal of custody was an extreme remedy that would greatly upset the children, but believed there was no other option. Mother contends that the children were mature and expressed a strong and clear preference to primarily reside with her as they had since the 2018 final divorce order until the court reversed custody at the January 13, 2025, hearing. We disagree. We note that Mother limits the support for her argument to *Jonpaul C.* and the "guidelines . . . as to areas which may have an effect on the weight placed on the child's decision" set forth in *Rose v. Rose,* 176 W. Va. 18, 21 n.4, 340 S.E.2d 176, 179 n.4 (1985). However, *Rose* did not involve claims of parental alienation.

West Virginia Code § 48-9-102a (2022) states that there is a rebuttable presumption "that equal (50-50) custodial allocation is in the best interest of the child." *Id.* The SCAWV has long held that the best interest of the child is the polar star by which the discretion of the court is to be guided. *See Brooke B. v. Ray,* 230 W. Va. 355, 361-62, 738 S.E.2d 21, 27-28 (2013). Further, this Court has stated,

> West Virginia Code § 48-9-206(a) [2022] presumes equal (50-50) custodial allocation of parenting time unless otherwise resolved by agreement of the parties. However, the family court may deviate from equal custodial time if the court expressly finds that the arrangement would be harmful to the child or that a provision of West Virginia Code § 48-9-209(f) [2024] necessitates another arrangement.

*Jonathon F. v. Rebekah L.*, 247 W. Va. 562, 564, 883 S.E.2d 290, 292 (Ct. App. 2023).

---

However, Mother failed to raise the issue of the 50-50 presumption or the application of limiting factors in her brief and thus, we will not address it.

West Virginia Code § 48-9-209(f)(5)(E) (2024) states as follows:

> In determining whether the presumption for an equal (50-50) allocation of physical custody has been rebutted, a court shall *consider* all relevant factors including any of the following: (5) Whether an equal (50-50) physical allocation is: (E) Contrary to the firm and reasonable preference of a child who is 14 years of age or older; and to accommodate, if the court determines it is in the best interests of the child, the firm and reasonable preferences of a child under 14 years of age, but sufficiently matured that he or she can intelligently express a voluntary preference for one parent . . . .

*Id*. (Emphasis added). Likewise, West Virginia Code § 48-9-402 (2022) permits a family court to modify a previous parenting plan without a showing of a changed circumstance if the modification is in the child's best interests and the modification is necessary to accommodate "the reasonable and firm preferences of a child" who is fourteen years of age or older. If the child is under fourteen and is sufficiently matured to intelligently express a voluntary preference, the modification is in the court's discretion. *Id*.

Here, the children were eleven, thirteen, fifteen, and seventeen years old. Father points out in his reply brief that the two oldest children met the statutory threshold for automatic consideration of their custodial preferences. However, the family court found that Mother had engaged in parental alienating behaviors that influenced the children's attitudes and behaviors toward Father. Although a sufficiently mature child who has attained the age of fourteen intelligently expresses a firm preference in a parent, a court is required to find that the preference is reasonable. *See* W. Va. Code § 48-9-209(f)(5)(E). Courts must also consider whether the child's preference is in the child's best interest.

The record reveals that, based upon the evidence presented, the family court did not find that any of the children's expressed preferences to remain with Mother were reasonable and noted that the children's statements often mirrored Mother's thoughts and opinions. As to the family court's decision to grant Father sole physical and legal custody of the children and to grant Mother limited, supervised parenting time, the family court specifically noted that it "did not take this action lightly" and that it "gave great weight to the uncontroverted testimony of the experts." The family court adopted the experts' opinions that Mother's alienating behavior influenced the children's feelings and thought processes related to Father. As such, we are unable to find that the family court erred by refusing to adopt the custodial preferences of the children.[6]

---

[6] We note that the family court's order does not articulate how it is maximizing Mother's parenting time. Mother went from having primary custody of the children to having "supervised parenting through a visitation facility up to two times per week, based on the availability of the provider" and three monitored fifteen-minute telephone calls with each child per week. West Virginia Code § 48-9-102a (2022) requires family courts to

Accordingly, finding no error or abuse of discretion, we affirm the family court's May 21, 2025, order.[7] The Clerk is directed to issue the mandate contemporaneously herewith.

Affirmed.

**ISSUED:** April 7, 2026

**CONCURRED IN BY:**

Chief Judge Daniel W. Greear
Judge Charles O. Lorensen
Judge S. Ryan White

---

construct a parenting time schedule which *maximizes* each parent's time when the presumption of 50-50 custody is rebutted. Petitioner, however, failed to allege that this failure was error.

[7] This Court may have adopted a different parenting plan if it had been the fact finder below. However, Mother's specific arguments on appeal do not allow us to grant the relief requested. Nothing in this decision should be construed to prevent Mother from filing a petition for modification as it relates to her compliance as a substantial change in circumstances.